IN THE DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

SHELTON JACKSON,                    )
                                    )
                    Petitioner,     )
                                    )
        vs.                         )        No. 08-CV-204-JHP-FHM
                                    )
RANDALL G. WORKMAN, Warden,         )
Oklahoma State Penitentiary,        )
                                    )
                    Respondent.     )

## OPINION AND ORDER

This is a 28 U.S.C. § 2254 habeas corpus action. Petitioner, Shelton Jackson, is an Oklahoma

death row prisoner. Jackson appears through counsel, challenging his first degree murder conviction

and death sentence in Tulsa County District Court Case No. CF-1997-1765 (Dkt. # 15). Respondent

filed a response to the petition (Dkt. # 27), and Jackson filed a reply (Dkt. # 30).  The state court

record has been provided.[1] For the reasons discussed below, the Court finds the petition for writ of

habeas corpus shall be denied.

## BACKGROUND

I.      Factual background

        In the early morning hours of April 8, 1997, the body of Jackson's girlfriend, Monica

Decator, was found by firefighters responding to a fire at her home in Tulsa, Oklahoma. It was

determined that Ms. Decator did not die as result of the fire, but from multiple stab wounds and

---

[1]      References to the transcript of the March, 2003, retrial shall be referred to as "Tr. Trans. Vol.
__ at __." References to motion transcripts shall be referred to as "Mot. Trans. (Date)  at__
____."  The original state court record for Tulsa County District Court Case No. CF-1997-
1765 shall be identified as "O.R. Vol. __ at __."

blunt force trauma to her head. Her two and one-half year old son, O. D.,[2] was discovered later that day underneath an abandoned house nearby. He was severely injured and near death. Jackson was apprehended in McAlester, Oklahoma, after police learned he was traveling by bus to Houston, Texas. Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts as found by the state court are presumed correct. Following review of the record, trial transcripts, and the admitted exhibits, this Court finds that the factual summary by the Oklahoma Court of Criminal Appeals (OCCA) is adequate and accurate. The Court, therefore, adopts the following summary as its own.

> Jackson had been living with his girlfriend Monica Decator and her two-an-a-half-year-old son, [O.D.], for several months before he killed her during the early morning hours of April 8, 1997. On April 7th, as was their practice, Jackson took care of Decator's son while she worked a twelve hour shift at a Tulsa hospital. According to Jackson, the child was fussy and crying uncontrollably that morning. Jackson said he lost his patience, picked the child up by the neck, and tossed him to the ground several times. Afterwards the child was quiet for some time. When the child began crying again that afternoon, Jackson pushed him down repeatedly. Following that episode, Jackson said the child could not walk, his eyes were "glazy," and he had so much difficulty breathing that Jackson used a screwdriver to pry the child's mouth open in an effort to help him breathe.

> The timing and sequence of events that followed was disputed at trial. The State contended that Jackson put the critically injured child in the crawlspace of a nearby vacant house and covered him with a large piece of carpet so no one could find him. He then went to a nearby Texaco and used Decator's ATM card to empty her bank account. He bought a gallon of gasoline there. That evening he watched wrestling at his uncle's apartment as he regularly did. Afterwards, he returned home and killed Decator so she could not report him for injuring her son. Earlier in the day Jackson provided an explanation for the absence of Decator and her child to his mother. He told her over the telephone that he, Decator, and the boy were leaving town together. He told his uncle the next morning he was going to Louisiana. He actually left town at noon on April 8, 1997.

> The account Jackson gave to the police differs from this sequence of events. He told police he did not put the child under the vacant house until after he fought with

---

[2]      Pursuant to this Court's local rule, the minor child shall be identified by only his initials. <u>See</u> Northern District of Oklahoma LCvR5.3.

Decator. He said he had left the child at home in bed when he went to his uncle's house to watch wrestling, and that when Decator returned to the house that evening, she believed her son was with him. Jackson said that Decator discovered her son's injuries when she heard him crying and went to him. That discovery led to a fight that ended when Jackson hit Decator several times in the head with a brick knocking her unconscious. Jackson said it was then he carried the child to the crawlspace of the nearby house. When Jackson returned from that mission, Decator was conscious. She attacked him with a knife. In response, he hit her again with the brick, gained control of the knife and fatally stabbed her.

Decator's body was discovered around 8:30 a.m. on April 8, when firefighters responded to a fire at her home. Fire investigators noted that gasoline had been poured throughout the house and concluded that the fire had been set intentionally. Decator did not sustain any injuries from the fire or smoke; she died as a result of blood loss from various stab wounds and head injuries caused by blunt force trauma. Police found two bloody knives on the floor and a brick with Decator's hair and flesh on it in the backyard.

Police apprehended Jackson later that afternoon when his bus bound for Houston stopped in McAlester. He had no visible injuries. Two Tulsa police detectives went to McAlester and returned Jackson to Tulsa where he made his statement confessing to injuring the child and killing Decator. In McAlester, he gave the detectives the child's general location, but the police could not find him. Later, before making his statement in Tulsa, Jackson gave police specific directions to the location of the critically injured child.

Jackson v. Oklahoma, 146 P.3d 1149, 1154-55 (Okla. Crim. App. 2006). Any additional facts[3]

necessary for a determination of Jackson's claims will be set forth in detail throughout this opinion.

## II.    Procedural history

Jackson was charged by Amended Information on April 29, 1997, with First Degree Murder

(Count 1), First Degree Arson (Count 2), and Injury to a Minor Child (Count 3). O.R. Vol. I at 24.

On June 30, 1997, the State filed a Bill of Particulars seeking the death penalty on the first degree

murder charge, and alleging the following four aggravating circumstances: (1) the defendant

---

[3]        The Court also adopts other specific factual summaries of the OCCA recited throughout this opinion. 28 U.S.C. § 2254(e)(1).

knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious, and cruel; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Id. at 48.  Following a jury trial held November 9-19, 1998, Jackson was found guilty of all three crimes. O.R. Vol. III at 438-40. The jury further found the existence of the first three (3) aggravating circumstances, but did not find the existence of a probability that Jackson would be a continuing threat to society. Id. at 516. The jury recommended that Jackson receive a sentence of death for the first degree murder conviction, thirty-five (35) years imprisonment and a $25,000 fine for first degree arson, and life imprisonment and a $5,000 fine for injury to a minor child. O.R. Vol. III at 513-15.          On appeal to the OCCA, Jackson's first degree murder conviction (Count 1) and death sentence were reversed and remanded for a new trial. Jackson v. State of Oklahoma, 41 P.3d 395, 401 (Okla. Crim. App. 2001). His convictions and sentences on Counts 2 and 3 were affirmed. Id.

Jackson's retrial was held March 10-27, 2003. He was represented at this trial by Oklahoma Indigent Defense system (OIDS) attorneys Craig Corgan, Mary Bruehl, Matthew Haire, and Emma Rolls. Once again, a jury convicted Jackson of first degree murder. Although the State sought the death penalty based on the same four aggravating circumstances, the trial judge dismissed the continuing threat aggravator. See Tr. Trans. Vol. 16 at 90. The jury in Jackson's second trial found the existence of the remaining three aggravating circumstances, and recommended a sentence of death. O.R. Vol. X at 1779-80. The trial judge, in accordance with the jury's recommendations,

sentenced Jackson to death for the first degree murder conviction. See Sentencing Tr. Trans. dated

May 2, 2003, at 4.

Represented by OIDS attorney Matthew Haire, Jackson filed a direct appeal of his conviction

and sentence for Count 1 in OCCA Case No. D-2003-470. He raised the following ten (10)

propositions of error:

| Proposition I: | Reversible error in jury selection occurred when the trial court refused to declare a mistrial upon proof of extraneous and prejudicial communication between potential jurors that unconstitutionally tainted the venire and denied Mr. Jackson's right to a fair and impartial jury. |
|---|---|
| Proposition II: | The evidence was insufficient to prove beyond a reasonable doubt the "great risk of death" aggravating circumstance. |
| Proposition III: | Errors in jury instructions deprived Appellant of a fair trial and reliable sentencing proceeding. |
| Proposition IV: | Appellant's death sentence must be vacated because there was insufficient evidence to support the "murder to avoid arrest or prosecution" aggravating circumstance. |
| Proposition V: | Mr. Jackson's Fifth Amendment right against self-incrimination, his right to due process under the Fourteenth Amendment and his corresponding rights under Article II, §§ 7 and 21 of the Oklahoma Constitution were violated by the admission of statements he made to law enforcement. |
| Proposition VI: | Appellant was denied due process and a reliable sentencing proceeding by the admission of highly inflammatory, irrelevant, and prejudicial evidence. |
| Proposition VII: | Mr. Jackson's death sentence violates the State and Federal Constitutions because mitigating factors outweighed evidence of aggravation introduced by the State. |
| Proposition VIII: | Mr. Jackson's death sentence must be vacated because the use of victim impact evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 19 of the Oklahoma Constitution. |

5

Proposition IX:    The aggravating circumstances found by the jury failed to perform the narrowing function required by the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition X:    The accumulation of errors in this case so infected the trial and sentencing proceedings with unfairness that Appellant was denied due process and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments.

See Brief of Appellant, filed November 29, 2004 in OCCA Case No. D-2003-470. On November 2, 2006, the OCCA affirmed the first degree murder conviction and death sentence. Jackson, 146 P.3d at 1168.

Next, represented by attorney Mark Henricksen, Jackson sought post-conviction relief from the OCCA in Case No. PCD-2003-670. He raised the following seven propositions of error:

Proposition One:    Mr. Jackson's trial counsel rendered ineffective assistance of counsel in violation of his rights under the 5th, 6th, 8th, and 14th Amendments to the United States Constitution and Art. 2 § 20 of the Oklahoma Constitution. Appellate counsel was ineffective for failing to raise the claim on direct appeal that the opinion of witness Farahkhan was inadmissible.

Proposition Two:    The trial court erred in denying Mr. Jackson's request for a continuance in order to call Dr. Merikangas for surrebuttal, denying Mr. Jackson his right to a fair trial and due process, and his 6th Amendment right to confrontation; trial counsel were ineffective in failing to object to the denial of a continuance and failure to defend Mr. Jackson's request; and appellate counsel was ineffective for failure to address this claim on direct appeal.

Proposition Three:    Ex parte meetings between the trial court and Mr. Jackson constituted a denial of the right to counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Art. 2 § 20 of the Constitution of the State of Oklahoma.

Proposition Four:    The absence of the trial court during presentation of Mr. Jackson's lengthy statement to law enforcement officials denied Mr. Jackson of his right to a fair trial and due process.

6

Proposition Five:      The death penalty violates the 5th, 8th, and 14th Amendments to the U.S. Constitution.

Proposition Six:       Lethal injection under current protocols violates the 8th and 14th Amendments, as does Oklahoma's procedure for devising said protocols.

Proposition Seven:     The cumulative impact of the errors complained of rendered the proceedings resulting in the conviction and sentence of death arbitrary, capricious and unreliable.

See Application for Post-Conviction Relief, Motion to Supplement, Motion for Discovery, and Petitioner's Application for Evidentiary Hearing, filed October 6, 2005, in OCCA Case No. PCD-2003-670. All requested relief was denied on March 27, 2008, in an unpublished opinion. See Dkt. # 15, Appendix, attachment 1 at 15. Jackson also filed a petition for writ of certiorari in the United States Supreme Court. On October 1, 2007, that request was denied. Jackson v. Oklahoma, 522 U.S. 838 (2007).

Jackson initiated this federal habeas action on April 11, 2008, by filing an application to proceed in forma pauperis (Dkt. # 2), and a request for appointment of counsel (Dkt. # 1).  His petition, filed on October 1, 2008, identifies the following thirteen (13) grounds for relief:

Ground One:        Reversible error in jury selection occurred when the trial court refused to declare a mistrial upon proof of extraneous and prejudicial communication between potential jurors that unconstitutionally tainted the venire and violated Mr. Jackson's right to a fair and impartial jury.

Ground Two:        Petitioner's trial counsel rendered ineffective assistance of counsel in violation of his rights under the 5th, 6th, 8th, and 14th Amendments to the United States Constitution. Appellate counsel was ineffective for failing to raise the claim on direct appeal that the opinion of witness Farahkhan was inadmissible.

Ground Three:      The evidence was insufficient to prove beyond a reasonable doubt the "great risk of death" aggravating circumstance.

7

Ground Four: Errors in jury instructions deprived Mr. Jackson of a fair trial and reliable sentencing proceeding in violation of his Sixth Amendment right to a fair trial, his Eighth Amendment right to a reliable sentencing, and his right to due process under the Fourteenth Amendment.

Ground Five: Mr. Jackson's death sentence must be vacated because there was insufficient evidence to support the "murder to avoid arrest or prosecution" aggravating circumstance.

Ground Six: Mr. Jackson's Fifth Amendment right against self-incrimination, [and] his right to due process under the Fourteenth Amendment were violated by the admission of statements he made to law enforcement.

Ground Seven: Mr. Jackson was denied due process and a reliable sentencing proceeding by the admission of highly inflammatory, irrelevant, and prejudicial evidence.

Ground Eight: Mr. Jackson's death sentence must be vacated because the use of victim impact evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article II, §§ 7, 9, and 19 of the Oklahoma Constitution.

Ground Nine: The trial court erred in denying Mr. Jackson's request for a continuance in order to call Dr. Merikangas for surrebuttal, denying Mr. Jackson his right to a fair trial, and due process, and his 6th Amendment right to confrontation; trial counsel were ineffective in failing to object to the denial of a continuance and failure to defend Mr. Jackson's request; and appellate counsel was ineffective for failure to address this claim on direct appeal.

Ground Ten: Ex Parte meetings between the trial court and Mr. Jackson constituted a denial of the right to counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Ground Eleven: The absence of the trial court during presentation of Mr. Jackson's lengthy statement to law enforcement officials denied Mr. Jackson of his right to a fair trial and due process.

Ground Twelve: Lethal injection under current protocols violated the 8th and 14th Amendments, as does Oklahoma's procedure for devising said protocols.

> Ground Thirteen:     The accumulation of errors in this case so infected the trial and sentencing proceedings with unfairness that Petitioner was denied due process and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments.

See Dkt. # 15.

## GENERAL CONSIDERATIONS

### I.      Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the Court must first consider exhaustion. Harris, 15 F.3d at 1554. Respondent advises that all of Jackson's claims are exhausted for purposes of federal habeas review. The Court agrees.

### II.     Procedural Bar

The Supreme Court has considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. See, e.g., Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground. Coleman v. Thompson, 501 U.S. 722, 750 (1991); Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000). A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998).  If the state court finding is "strictly or regularly followed" and applied "evenhandedly to all similar claims," it will be considered "adequate."  Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Wainwright, 433 U.S. at 91. The "cause" standard requires Jackson to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986). Examples of such external factors include the discovery of new evidence, a change in the law, or interference by state officials. Id. He must also show "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982). Alternatively, the "fundamental miscarriage of justice" exception requires a petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted. McCleskey v. Zant, 499 U.S. 467, 495 (1991). He must make "a colorable showing of factual innocence" to utilize this exception. Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000). It is intended for those rare situations "where the State has convicted the wrong person of the crime. . . . [Or where] it is evident that the law has made a mistake." Klein v. Neal, 45 F.3d 1395, 1400 (10th Cir. 1995).

## III.    Standard of Review - AEDPA

This Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow, 474 F.3d at 696). When a state court has adjudicated the merits of a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly

10

established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(1)(2); Williams v. Taylor, 529 U.S. 362, 402 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).   A legal principle is "clearly established" within the meaning of § 2254(d)(1) only when it is embodied in a holding of the Supreme Court. See Carey v. Musladin, 549 U.S. 70, 74 (2006).

The first step in applying the § 2254(d)(1) standard is to assess whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings of the Supreme Court. House v. Hatch, 527 F.3d 1010, 1016-17 (10th Cir. 2008). If clearly established federal law exists, the Court must then consider whether the state court decision was contrary to or involved an unreasonable application of Supreme Court law. Id. at 1018. When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002). It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002). Further, the Supreme Court has recently held that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."   Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  Thus, "evidence introduced in federal court has no bearing on §2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court." Id. at 1400 (footnote omitted).

11

Application of § 2254(d)(2) requires the Court to review any factual findings of the state court to ascertain whether they were unreasonable in light of the evidence presented at trial. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen,130 S.Ct. 841, 849 (2010) (citing Williams, 529 U.S. at 410). The "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Jackson's habeas proceedings in the instant matter commenced well after the effective date of AEDPA. Therefore, to the extent Jackson's claims are cognizable in this federal habeas corpus proceeding and not procedurally barred, those claims shall be reviewed pursuant to § 2254(d). Insofar as Jackson claims a violation of the Oklahoma Constitution (e.g., Ground 8), those claims are denied because they are not cognizable on federal habeas corpus review. A federal habeas court has no authority to review a state court's interpretation or application of its own state laws. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions). Instead, when conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975)).

## GROUNDS FOR RELIEF

**I.     Tainted venire (ground one)**

In his first ground for relief, Jackson claims he was denied his constitutional right to a fair and impartial jury due to numerous "appalling, egregious and abominable" instances of misconduct committed by members of the jury pool from which his jury was selected. As the OCCA noted on direct appeal, "Jackson maintains that the entire jury pool was infected by the widespread violation of the trial court's instruction not to discuss the case and to report any violation of that instruction." Jackson, 146 P.3d at 1155. The claim was denied on the merits by the OCCA. Id. at 1156. Jackson contends that the OCCA's factual conclusion that "[n]one of the twelve jurors seated in the jury box undergoing the final selection process had heard of any discussion about the case or the defendant" was erroneous. See Dkt. # 30 at 6. Thus, he seeks habeas corpus relief under AEDPA.

As noted earlier, the trial under review here is actually a retrial of Jackson's first degree murder count. The original trial, reversal by the OCCA,  and subsequent retrial received considerable media attention. At the retrial, the large jury pool was given a written questionnaire to fill out before any questioning began. Tr. Trans. Vol. 1 at 9. The trial judge then asked general questions of potential jury members, followed up with individual questioning, if necessary. Id. at 44-176. Next, the attorneys were allowed to conduct voir dire.  On the third day of voir dire, problems surfaced when it was learned that some of the potential jurors may have had prior knowledge of the case that they did not reveal initially, and that some jurors may have been

discussing the case among themselves in violation of the court's orders.[4] The OCCA described the

trial judge's actions at this point, as follows:

> The record shows the district court questioned all remaining prospective jurors extensively regarding their exposure to any improper communication about the case or the defendant. None of the twelve jurors seated in the jury box undergoing the final selection process had heard any discussion about the case or the defendant. The district court carefully conducted the individual *voir dire* questioning to avoid tainting the entire venire and pursued every allegation of misconduct. Questions were tailored to elicit whether potential jurors had been exposed to any extraneous information and, if so, whether it affected their ability to be fair and impartial. The district court exercised extreme care to ensure that any prospective juror who was potentially tainted did not infect the venire and did not serve. We are unwilling to find that the number of jurors exposed to improper conversations by itself necessitates a finding that the entire pool was tainted. There is no credible evidence that the measures taken by the district court were insufficient to cure the effects of the juror misconduct or that any juror who would not follow the law was impaneled. The trial court did not err in overruling Jackson's motions for mistrial and to quash the jury pool.

Jackson, 146 P.3d at 1156.

In support of his current claim that the OCCA's decision was wrong, the jury pool was

tainted, and the trial judge erred in not granting his various motions for a mistrial, Jackson points

to the alleged misconduct of the following venire members:

Patricia Pingatore - During the court's voir dire of potential jurors, the judge asked Ms. Pingatore if she had read, heard or observed anything about this case. Tr. Trans. Vol. V at 336. When she responded affirmatively, he asked her to approach the bench for further questioning outside the hearing of the remaining venire. Ms. Pingatore advised the court that she had read the newspapers and saw the story of the crime on television when it originally happened. She did not recall any of the specifics of the crime, other than that "the boy" was injured. Id. at 337-39. She also stated that she knew there was in article in that day's newspaper about the case, but she did not see or read the article itself. She overheard someone at lunch mention the article. Defense counsel asked that

---

[4] According to the OCCA, "Information concerning improper communications came to light on the third day of trial after the parties had passed the panel for cause and exercised six peremptory challenges." Jackson, 146 P.3d at 1156 n.2.

Ms. Pingatore be removed for cause, but the court denied the motion. Id. at 146. During the remainder of the voir dire process, Ms. Pingatore was not removed for cause or through peremptory challenges. She became a jury member in Jackson's trial.

Daniel Hobson -   In a private conference with the judge and attorneys, Daniel Hobson advised that he was told information about the case by another potential juror who had searched the internet during the lunch break. Id. at 350-54. He said there were others in the group who were told the information, and he would identify those individuals for the court. Id. Based on the information he was given about the case, Mr. Hobson said he could not be a fair and impartial juror Id. at 357-58. He was dismissed for cause. Id. at 360, 417.

David Hall -   Mr. Hall was identified by Daniel Hobson as the person who had researched the case on the internet. During a private voir dire, Mr. Hall admitted that he had searched the judge's docket on the internet to find out what case he might be called for. Upon learning that it was Jackson's retrial he remembered many details of the crime from the media coverage surrounding the first trial. Id. at 363-67. He admitted that he discussed some of what he had learned from his internet search with three or four others in the venire. Id. at 368-69. Mr. Hall identified Clark Boyd as one of persons in the group when he discussed his knowledge of the case. Mr. Hall was excused for cause. Id. at 376, 400.

Clark Boyd -   Having indicated to the court's bailiff that he wanted to talk to the judge, Mr. Boyd was summoned for private voir dire. Id. at 378. He told the court that Randy Wheeler said, "I don't have time for this; I have a job to do; I would just as soon they put the cross hairs between the nigger's eyes right now." Id. at 380. He said there were others standing around but he did not know if they were listening. Id. at 382. When questioned about David Hall's internet search, Mr. Boyd said he did not know anything about it. Id. at 387. Mr. Boyd also admitted to the court that he had lied on his jury questionnaire about a previous arrest. Id. at 391. He was excused for cause. Id. at 399, 405.

Randy Wheeler -   When called for individual questioning, Mr. Wheeler denied that he had made any racial slurs about the defendant. Id. at 433. He also denied making comments about Jackson being "placed in the cross hairs of a weapon." Id. at 434. He did admit, however, having strong feelings about the case and said he could not be fair and impartial. Id. at 435. He was removed for cause. Id. at 438-39.

Jim Burdge -   Mr. Burdge was questioned individually when he answered the question asked of the general venire whether anyone had heard anything about the case. He admitted that he was one of the persons who heard David Hall

15

discuss his internet research and it triggered his own memories of the case and the first trial. Mr. Burdge was excused for cause. Id. at 430

Sandra Mantooth - During individual questioning by the court, Ms. Mantooth stated that she had overheard in the jury pool room that there was something in the paper about the case. Tr. Trans. Vol. VI at 457.

Angela Gross - When initially asked if she had heard anything about the case during individual questioning, Ms. Gross said that some of her friends had discussed the death penalty and general issues around her because they knew she was on jury duty. She denied hearing anything about the case at the courthouse, or talking to anyone about the case. Id. at 474-75. Ms. Gross then volunteered that her father was a sheriff who worked at the courthouse but she did not have a conversation with him about the case. Id. at 476-77. When recalled for further questioning, she said her father was a retired Tulsa police officer and was involved in Jackson's first case. Id. at 509. She also denied talking to Mr. Boyd and Ms. Hudson about the comments Randy Wheeler made to Clark Boyd. Id. at 506-507. However, she admitted that she could not be a fair and impartial juror, and was excused for cause. Id. at 511-12.

Patrica Doughtery - During her individual voir dire, Ms. Doughtery stated that she had heard an "indirect comment" from another venire member who said that being involved in the jury would cause him a hardship on his income. Id. at 479. She did not know the name of the man who made the comment, but said he indicated his trucking business would go bankrupt if he served.

Mark Wright - Mr. Wright served on Jackson's jury. During individual voir dire questioning, he told the judge that the only things he heard from others were general comments about the long time it was taking to pick a jury. Id. at 491.

Cheryl Hudson - In her private voir dire, Ms. Hudson told the court that she was one of the persons who had lunch with Clark Boyd when he revealed the racially derogatory comments spoken by Randy Wheeler. Id. at 494-95. She recalled the comments were something like "Let the nigger fry," and that Mr. Wheeler wished he could go home and get a picture over the internet of an electric chair and transfer it to his shirt to wear to court the next day. Id. at 499. Ms. Hudson said that the comments did not influence her, and that she could be fair and impartial. She also said she had not told the court about it earlier because she did not hear the original comments and didn't feel like she could substantiate that they were made. Id. at 501.

Aaron Wright - When questioned by the judge, Mr. Wright said he overheard some people in the garage say that the case was in the paper and that it was "gruesome." Id. at 550-51. He said it was his impression that people involved in the jury

selection process were disobeying the court's order about talking about the case. Id. at 557. Based upon other comments Mr. Wright made about his life experiences, the court excused him for cause. Id. at 561.

Jeffrey Twilley -   Mr. Twilley told the court about a conversation he had with another man in the jury pool who said "something about a conviction." However, when Mr. Twilley volunteered that he was friends with a prosecutor from another county and admitted he would not want a person like himself on his jury if he were the defendant, he was excused from jury service for cause. Id. at 579.

Mariel Ariea -   Ms. Ariea stated that she heard a lot of people whispering in the courtroom when the judge mentioned the case. She did not hear anything specific, but assumed people were trying to remember if they knew anything about the case. Id. at 597-99.

Rachel Nies -   Ms. Nies told the judge that she had heard people grumbling about the length of the jury selection process. Id. at 647. She also said that she had heard people briefly talk about the history of the case. Id. at 648.

Melvin Powell -   Mr. Powell also stated that he had heard some grumbling from others about the length of the jury selection process. Further, he had heard at least one comment that Jackson's first case was a mistrial, and this was the second time around. Id. at 663. He believed that he could be a fair and impartial juror, and ultimately was chosen to serve on Jackson's jury.

Heather Wadley, Martha Jones, and Shanna Hobson - These women were identified by other potential jurors as being the ones who discussed the history of the case. When recalled for a second interview with the judge, Ms. Wadley and Ms. Jones denied ever having had any knowledge or conversation about the case. Id. at 668-70. Ms. Hobson admitted that she heard someone say there had previously been a mistrial in the case. Id. at 674. The judge excused all three for cause "out of an abundance of caution." Id. at 682-83.

In addition to the above, the trial judge questioned all remaining venire members individually to ascertain whether they knew or had heard anything about Jackson or the case.

Of those persons pointed to by Jackson and discussed above, only three were seated on Jackson's jury: Patricia Pingatore, Mark Wright, and Melvin Powell. Rachel Nies was an alternate.[5]

---

[5]   Although Jackson claims he identified Courtney Hughes as one of the potential jurors who was exposed to discussions about the case and the defendant (Dkt. # 15 at 44) he made no

Because jurors Pingatore, Wright, and Powell had told the court about what they knew or heard, Jackson contends that the OCCA's finding that none of the jurors "had heard any discussion about the case or defendant" was an unreasonable determination of the facts which entitles him to habeas relief. See Dkt. # 15 at 44.   The Court agrees that the OCCA's statement is inaccurate. Juror Pingatore vaguely remembered some of the factual background of Jackson's first trial and knew something was in the newspaper about the case. Juror Wright overheard other members of the jury pool complaining about the lengthy jury selection process. Juror Powell heard someone say that the case originally resulted in a mistrial.

However, the OCCA's decision was not "based on" this inaccurate statement of fact as would warrant habeas corpus relief. 28 U.S.C. § 2254(d)(2). Rather, the OCCA's determination that the trial court had not erred was based on the judge's extensive efforts to investigate juror misconduct by questioning all remaining jurors about their exposure to any improper communications and taking measures to cure the effects of any juror misconduct. Jackson, 146 F.3d at 1156. Jackson did not provide to the OCCA, nor has he provided to this Court, any evidence that the measures taken by the trial court were insufficient and resulted in the impaneling of a biased juror. The trial judge thoroughly investigated all misconduct allegations about potential jurors and took extraordinary steps to insure that none of the remaining members of the venire were tainted by improper communications. Jackson's argument that "nobody in the array complied with the court's repeated admonishments not to discuss the case" is speculative and unsupported. Pure speculation cannot form the basis for habeas relief. Smallwood v. Gibson, 191 F.3d 1257, 1280 n.14 (10th Cir. 1999).   Further, Jackson has not demonstrated that the jurors who ended up on his panel were

other mention of her in his habeas petition. Ms. Hughes was seated as an alternate juror.

prejudiced or tainted by the misconduct of others, as required under Oklahoma law. Warner v. State, 144 P.3d 838, 859 (Okla. Crim. App. 2006) (finding that an appellant requesting a new trial based on juror misconduct bears the burden of showing both juror prejudice and harm). The Supreme Court has advised:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence present in court.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961) (internal citations omitted). To insure an impartial jury, " a trial court must take measures adapted to the intensity, pervasiveness, and character of the pretrial publicity and community animus." Skilling v. United States, -- U.S. --, 130 S. Ct. 2896, 2949 (2010). The OCCA assessed the trial court's procedures, and determined that they were sufficient to keep the jury free from disqualifying bias. The OCCA then concluded that Jackson's right to a fair trial before an impartial jury was not violated. Jackson has not established that his jurors were impartial or that the OCCA's decision was based on an unreasonable determination of the facts. Nor has he demonstrated that the OCCA's finding was contrary to or an unreasonable application of Supreme Court law. 28 U.S.C. § 2254(d). Habeas relief shall be denied on Jackson's ground one claim.

## II.    Ineffective assistance of counsel (ground two)

In his second ground for relief, Jackson presents several claims that his attorneys were constitutionally deficient in their representation at trial and on direct appeal. More specifically, he

19

contends that his constitutional rights were violated when: (1) trial counsel failed to prepare adequately for the testimony of defense witness Arthur Luqman Farahkhan; (2) trial counsel failed to object to Farahkhan's cross-examination statement containing an improper opinion about the death penalty; (3) appellate counsel was ineffective for failing to raise the claim that it was error to allow Farahkhan's opinion testimony; (4) trial counsel was ineffective in the investigation, development, and use of psychological evidence presented by defense expert witness Dr. James Merikangas; (5) trial counsel failed to properly cross-examine the state's expert witnesses; and (6) trial counsel failed to present evidence of Jackson's good behavior record at the penitentiary.

The OCCA denied relief on the merits[6] of each of these claims in Jackson's post-conviction proceedings. It is Respondent's position that the OCCA's rulings were not contrary to, or an unreasonable application of, clearly established Supreme Court law, nor were they based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Testimony of Arthur Farahkhan*

The first three sub-parts of Jackson's ground two claim pertain to counsels' handling of defense witness Arthur Farahkhan's second stage testimony. Farahkhan was presented as a mitigation witness who testified about working with Jackson developing a program to assist disadvantaged youth. He testified on direct exam that he met Jackson in 1992 or 1993 while managing a satellite office in north Tulsa for the Palmer Drug Abuse Program. Tr. Trans. Vol. 17 at 122-23. Farahkhan stated that Jackson helped get between 50 to 100 youth into the program

---

[6]     The OCCA decided that the merits of the ineffective assistance of trial counsel claims had to be addressed and could not be considered procedurally barred because "appellate counsel was also one of Jackson's trial attorneys." Dkt. # 15, Appendix, attachment 1at 3.

because "he really wanted to see those people in Comanche who had alcohol, drug, gang problems, to be able to overcome those problems." Id. at 126. He testified that he knew Jackson as a "leader" who tried "to help to better people's lives." Id. at 128. On cross-examination, however, the prosecutor elicited the following testimony from Farahkhan:

> Q:     Did you know or do you know that he [Jackson] intentionally bludgeoned his girlfriend, Monica Decator, with a brick at least seven times on the head, then stabbed her in the neck at least eight times cutting her jugular, her common carotid artery, then stuck a knife two times right by her heart? Did you know he did that?
>
> A:     I listened closely to the language you used, and you said intentionally. Did I know that he intentionally did that?
>
> Q:     Yes.
>
> A:     No, I did not know that he intentionally did that.
>
> Q:     Does that change your opinion any?
>
> A:     If I accept what you said, that he intentionally did it, it would change my opinion. But I don't believe that he intentionally did it.
>
> Q:     If you believe that he intentionally did it, do you think the death penalty would be appropriate?
>
> A:     Yes.

Id. at 129-30. No further questions were asked of this witness by the prosecution or by defense counsel. Id. at 3. Jackson claims that Farahkhan's "devastating and prejudicial" opinion testimony resulted from counsel's decision to call Farahkhan even though counsel knew Farahkhan believed Jackson was deserving of the death penalty. Dkt. # 15 at 52-53. He also claims that counsel was ineffective for failing to object to the prosecution's question, and appellate counsel was ineffective for failing to raise these issues on direct appeal.

The OCCA rejected these claims on post-conviction, finding as follows:

21

Counsel's strategy in calling Farahkhan as a witness in Jackson's capital sentencing proceeding was neither unreasonable nor unsound. Farahkhan presented relevant mitigating evidence about his experience with Jackson for the jury to consider. Nor can we find that counsel was ineffective for failing to object during cross-examination. Cross-examination is the means of testing the reliability and credibility of a witness. *See Hawkins v. State*, 1989 OK CR 72, ¶ 12, 782 P.2d 139, 141. It is the vehicle by which the believability of a witness and the truth of his testimony are tested. *Id.* For this reason, the cross-examiner is permitted to delve into the witness's story to test the witness's perceptions and the basis for those perceptions. *See id.* Cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand is proper. *See id.* The partiality of a witness is a permissible subject to explore at trial, and is always relevant to judge the weight of the witness's testimony. *Id.*

Farahkhan, who had a positive relationship with Jackson, understandably did not believe his friend intentionally killed Decator. The prosecutor's question of Farahkhan asking if his opinion would change if he knew that Jackson intentionally murdered Decator was permissible to test his credibility and expose his bias. The hypothetical question put to Farahkhan asking if the death penalty would be appropriate in this case if he believed the murder was intentional was error. The jury, however, was not misled by this exchange because it was evident that Farahkhan was not advocating the death penalty for his friend. Putting Farahkhan on the witness stand was not deficient performance by trial counsel. Further, we do not find that his testimony on cross-examination either erased the benefits of his testimony on direct examination or affected the outcome of the second stage of this trial. Under the *Strickland* test, Jackson has not shown that his trial attorneys were ineffective for putting Farahkhan on the stand or for failing to object during cross-examination.

<u>See</u> Opinion Denying Application for Post-Conviction Relief, Motion for Discovery and Request for Evidentiary Hearing, in OCCA Case No. PCD-2003-670 (Dkt. # 15, Appendix, attachment 1). Because the OCCA ruled on the merits of Jackson's claims of ineffective assistance of trial counsel insofar as they relate to Farahkhan's testimony, Jackson must demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d). The Court finds that he has failed to meet this burden.

The OCCA correctly relied upon <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in analyzing Jackson's ineffective assistance of counsel claims. To prevail on a claim of ineffective assistance of counsel, a petitioner must show: (1) counsel's representation fell below an objective standard of reasonableness; and (2) a reasonable probability that, but for counsel's error, the results of the proceedings would have been different. <u>Strickland</u> 466 U.S. at 687  The state court first determined that trial counsel's performance was not deficient in presenting Farahkhan as a mitigation witness because he "presented relevant mitigating evidence about his experience with Jackson for the jury to consider." As noted by Respondent, Farahkhan provided unique testimony that no other mitigation witness presented.  When responding to the prosecutor's hypothetical question, Farahkhan clearly stated that he did not believe Jackson intentionally killed Decator. Thus, his positive response to the hypothetical question could not have convinced the jury that Farahkhan believed Jackson deserved the death penalty. The Court concludes that the OCCA's adjudication of this portion of Jackson's claim was not unreasonable.

Jackson next contends that trial counsel's failure to object to the prosecutor's hypothetical question constituted ineffective assistance of counsel. Although, the OCCA determined that the prosecutor's question was error, trial counsel's failure to object did not rise to the level of a constitutional violation. The Court agrees with the OCCA's conclusion that the jury "was not misled by this exchange because it was evident that Farahkhan was not advocating the death penalty for his friend."  Counsel's failure to object was not constitutionally deficient, nor was the deficiency prejudicial to Jackson under the <u>Strickland</u> standard.

Jackson also claims that Farahkhan's answer to the prosecutor's hypothetical question was actually victim impact testimony, in violation of the state statute governing such testimony. The OCCA rejected this argument on the merits, finding:

> Jackson argues Farahkhan's testimony about the appropriateness of the death penalty in this case constituted improper victim impact evidence of a recommended sentence. We disagree. The prosecutor did not ask Farahkhan to recommend a sentence for his friend Jackson. The jury understood that Farahkhan did not believe that his friend intentionally killed Decator and, as such, was not advocating the death penalty for Jackson in this case. We find no violation of the statutory provisions for sentence recommendations in victim impact testimony.

Dkt. # 15, Appendix, attachment 1 at 6. Jackson has failed to convince this Court that the OCCA's decision was an unreasonable application of Supreme Court law, or was an unreasonable determination of the facts. He is not entitled to habeas relief on this claim.

Finally, Jackson contends his appellate counsel was constitutionally ineffective for failing to raise these ineffective assistance of trial counsel claims on direct appeal. The Strickland test also applies when assessing the effectiveness of appellate counsel. United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995). When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the Court first examines the merits of the omitted issue. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. Cargle v. Mullin, 317 F.3d 1196, 1201 (10th Cir. 2003). The Court has determined the omitted ineffective assistance of trial counsel claims relating to witness Farahkhan lacked merit. Thus, Jackson's appellate counsel was not ineffective for failing to raise these issues on appeal.

*Testimony of Dr. Merikangas*

24

In the next part of Jackson's ground two proposition, Jackson complains of alleged deficiencies in trial counsel's investigation, development and use of second stage mitigation witness, James R. Merikangas, M.D.  More specifically, he complains that trial counsel did not question Dr. Merikangas about his review of a neuropsychological exam report prepared by licensed psychologist Dale G. Watson, Ph.D. He contends that the results of Dr. Watson's neuropsychological exam contained "critical mitigating evidence" and should have been used as support for Dr. Merikangas' conclusions. Finally, he objects to the fact that the State presented an expert as a rebuttal witness who provided damaging testimony by disagreeing with the conclusions reached by Dr. Merikangas. This proposition was raised on post-conviction, and denied on the merits by the OCCA. Respondent contends that the OCCA's extensive review and rejection of this claim is reasonable. Thus, he argues that Jackson is not entitled to relief under the AEDPA. The OCCA's analysis in rejecting this claim follows:

> Jackson also complains that his trial attorneys were ineffective in investigating and presenting psychological evidence through defense expert Dr. James Merikangas. The crux of Jackson's claim is that his trial attorneys' examination of this expert failed to immunize his opinion that Jackson had brain damage from attack by the State's expert witness. Dr. Merikangas is a neuropsychiatrist called by Jackson in second stage to testify about Jackson's neurological examination and his review of Jackson's neurological testing. He concluded that Jackson has brain damage in his left frontal lobe dating back to Jackson's infancy or early childhood and that the damage affects Jackson's ability to plan, to control his life and to manage anger. He testified that individuals with this type of brain damage are prone to explosive angry outbursts and irrational behavior.

> The next day the defense presented the remainder of its second stage case and, in rebuttal, the State called Dr. George Carstens, a neuroradiologist, who reviewed Jackson's single proton emission computed tomography (SPECT) scan and his magnetic resonance imaging (MRI) test. Dr. Carstens concluded that neither test showed any brain abnormalities. In Dr. Carstens's opinion, Jackson had no signs of brain damage. Dr. Carstens also identified the formal report from Jackson's SPECT scan in which the reviewing doctor concluded that the test showed a normal brain

profusion scan. Dr. Carstens testified that his conclusions were consistent with the SPECT scan report.

Post-conviction counsel has provided this Court with an affidavit from Dr. Merikangas challenging the testimony of Dr. Carstens. Jackson contends now that trial counsel should have: (1) questioned Dr. Merikangas in depth about the neuropsychological examination conducted by Dr. Watson in July 2000 to bolster his opinion and credibility instead of merely asking if his findings were consistent with the documents he reviewed; (2) called Dr. Watson as an additional expert witness for the defense to establish that Jackson does, indeed, have brain damage; and (3) questioned Dr. Merikangas about the SPECT scan report so he could explain how his opinion could be reconciled with it.

We understand the temptation for a defendant to second-guess counsel's assistance after conviction and adverse sentence. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. A fair assessment of attorney performance, however, requires that every effort be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Dr. Merikangas's expert opinion that Jackson had significant brain damage was well supported. Dr. Merikangas identified the types of records he reviewed, the tests he ordered (MRI, SPECT scan, EEG, and blood tests), and the physical examination he conducted. He explained to the jury how his consideration of the results of these tests, his physical examination of Jackson, and his review of Jackson's history led to his conclusion. Dr. Merikangas's credentials show that he is well-trained and an expert in his field.

Contrary to Jackson's claim, the testimony of the State's expert witness, Dr. Carstens, was neither free from attack nor unchallenged. Jackson's jury was aware that Dr. Carstens looked at only two tests (Jackson's MRI and SPECT scan). He also admitted that although both examining a patient and obtaining his history were important factors in reaching a conclusion, he had done neither in Jackson's case. Dr. Carstens admitted on cross-examination that one of Jackson's images showed asymmetry indicative of abnormality, but explained his belief that the asymmetry was the result of Jackson's positioning during the test. Defense counsel also asked Dr. Carstens about the formal report of Jackson's electroencephalogram (EEG) test that evidently showed abnormalities. Dr. Carstens testified that he had not seen the report and that he did not have the necessary training to interpret the report and give an opinion on it.

Trial counsel persuasively presented relevant mitigating evidence that Jackson has brain damage and intelligently challenged the conclusions to the contrary of the

State's expert during cross-examination. We cannot find that trial counsel was ineffective on this record.

Dkt. # 15, Appendix, attachment 1 at 7-9 (footnotes 3 and 4 omitted). Jackson disagrees with the OCCA's findings and asserts his trial counsel's handling of Dr. Merikangas' testimony was both deficient and prejudicial under Strickland. However, the standard for judging counsel's representation is a most deferential one, and this Court will not "second-guess counsel's assistance." Strickland, 466 U.S. at 689. Because "the standards created by Strickland and § 2254(d) are both highly deferential, when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, 131 S.Ct. 770, 788 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).

In his testimony, Dr. Merikangas explained that as a neuropsychiatrist, he "does both neurology and psychiatry and deals with the whole person and how their brain works and how they think and treats them medically." Tr. Trans. Vol. 16 at 102. Jackson acknowledges that the doctor conducted several tests and testified that he found neurological findings consistent with brain damage. See Dkt. # 15 at 75. He complains that results from Dr. Watson's earlier neurophyschological exam were not referenced in Dr. Merikangas' testimony due to the deficient direct examination conducted by trial counsel. A careful review of Dr. Watson's report, however, reveals that testimony relating to the report would most certainly have been subjected to strenuous cross-examination as he concluded in his report that, "[T]he pattern of results found in the evaluation of Mr. Jackson does not explain his behavior during the commission of his crimes. . . . Further neurodiagnostic evaluation might be more illuminating in identifying specific regional areas of brain dysfunction -- i.e., a SPECT or PET scan, though the basic data reported here will not change." Dkt. # 15, Appendix, attachment 6 at 13. Dr. Watson also concluded that the results of the battery of tests he gave Jackson "does suggest that Shelton Jackson has a moderate degree of brain dysfunction."

Id. at 12. Despite Jackson's argument that the report was "critical evidence," the Court is not convinced that its omission constituted ineffective assistance of counsel. He has not demonstrated that there is a reasonable probability that, but for counsel's omission of presenting any evidence relating to Dr. Watson's report, the result of the sentencing proceeding would have been different. Strickland, 466 U.S. at 696.

Likewise, the Court does not find counsel was ineffective because Dr. Merikangas' testimony was disputed by the State's expert. The parties presented dueling expert testimony on the issue of Jackson's brain scans. There is no way to know whether the jury believed one expert over the other, or concluded that the testimony of the two witnesses canceled each other out. Nonetheless, Jackson provides no reason to suppose that additional preparation of Dr. Merikangas, further cross-examination of the State's expert, or surrebuttal of Dr. Merikangas would have resulted in the jury deciding a punishment other than the death penalty. The possible uncertainties created by the experts were not the result of ineffective assistance of trial counsel in dealing with Dr. Merikangas. Jackson has failed to show that his trial counsel made errors so serious that counsel was not functioning as the counsel guaranteed him by the Sixth Amendment to the Constitution.

Finally, the Court finds no constitutional error insofar as trial counsel was unable to present Dr. Watson to testify. Citing Ake v. Oklahoma, 470 U.S. 68 (1985), he argues that his trial counsel was rendered ineffective by the OIDS administrator's refusal to provide funds to obtain the presence of Dr. Watson as a second stage witness. The record indicates that trial counsel sought and obtained funding to obtain psychiatric testing by Dr. Marikangas. The record further indicates that appellate counsel sought and obtained funding for psychological testing and evaluation conducted by Dr. Watson. It was not until Jackson's counsel sought funds to bring Dr. Watson to trial to testify in the

second trial that funding requests were denied by OIDS. As noted in an earlier section, the Court is unable to conclude that the presentation of Dr. Watson's testimony would have altered the outcome of the punishment phase. Even analyzing Jackson's claim under the Ake standard, the Court is unable to conclude that the additional evidence contained in Dr. Watson's report on Jackson's psychological problems would have been sufficient to overcome the three aggravating factors found by the jury. Habeas relief is denied on this claim.

*State's expert witness*

Jackson next contends that his trial counsel provided ineffective assistance in his cross-examination of the State's expert witness, Dr. Carstens. As he did in his application for post-conviction relief, Jackson states that his trial counsel failed to impeach Dr. Carstens with Dr. Watson's report, failed to elicit the fact that the author of the SPECT report was not a neuroradiologist, and failed to question Dr. Carstens about the validity of his opinion based on his review of tests alone. Rejecting this claim in post-conviction proceedings, the OCCA found:

> Trial counsel did not allow Dr. Carstens's opinion to go unchecked. We are unconvinced that the outcome of the trial would have been different had defense counsel cross-questioned Dr. Carstens in a different or more extensive way.

Dkt. # 15, Appendix, attachment 1 at 10. "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. Jackson's trial counsel elicited important concessions from Dr. Carstens on cross-examination, such as the fact that he did not review Jackson's past medical records, did not obtain a family history, did not perform a physical or neurologic examination of Jackson, and did not review reports prepared by other doctors concerning Jackson's tests. This Court will not second-guess counsel's strategy on cross-examination. Jackson has not shown that the

OCCA's decision was an unreasonable application of <u>Strickland</u>. He is not entitled to habeas corpus relief on this claim.

*Evidence of good behavior in prison*

In the final sub-part of Jackson's ground two claim, he contends that his trial attorneys rendered ineffective assistance of counsel during the second stage of trial because they did not present evidence of Jackson's good behavior in prison as allowed by <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986). The Supreme Court has held that a capital defendant "must be permitted to introduce in mitigation evidence of postcrime good prison behavior to show that he would not pose a danger to the prison community if sentenced to life imprisonment rather than death." <u>Boyde v. California</u>, 494 U.S. 370, 382 n.5 (1990) (citing <u>Skipper</u>, 476 U.S. 1). However, the issue in both the <u>Skipper</u> and <u>Boyde</u> cases was whether trial counsel should have presented evidence of good behavior in prison to counteract the prosecution's claim that the defendant would be a continuing threat to society. "Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of <u>Lockett</u>[7] and <u>Eddings</u>[8] that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" <u>Skipper</u>, 476 U.S. at 5, n.1 (quoting <u>Gardner v. Florida</u>, 430 U.S. 348, 362 (1977)).

---

[7]     <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978).

[8]     <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982).

In Jackson's case, the trial judge dismissed the continuing threat aggravating circumstance before second stage issues were given to the jury for consideration. The OCCA found on post-conviction that:

> Lastly, Jackson claims that his trial attorneys were ineffective for failing to put on evidence of his good behavior in prison. The trial court dismissed the continuing threat aggravating circumstance to which such evidence is particularly relevant. Jackson's jury was instructed to consider a list of mitigating factors, including that Jackson had shown a potential for contributing affirmatively to the lives of friends, other inmates and prison staff. Under these circumstances, we find that Jackson has failed to show that his trial attorneys were ineffective for failing to introduce evidence of his good conduct in prison.

Dkt. # 15, Appendix, attachment 1 at 10. Jackson has failed to demonstrate that the OCCA's ruling was an unreasonable application of Supreme Court law, or based on an unreasonable determination of the facts. He is not entitled to habeas relief on this claim.

III.     **"Great risk of death" aggravating circumstance (ground three)**

As he argued at trial and on direct appeal, Jackson claims in ground three that the evidence was insufficient to support the aggravating circumstance that he knowingly created a great risk of death to more than one person. He further argues that the OCCA's rejection of this issue is not entitled to deference, and was an unreasonable application of Brown v. Sanders, 546 U.S. 212 (2006). Finally, he contends that the OCCA's policy of reweighing valid aggravating circumstances after finding one or more aggravating circumstance invalid is a violation of Ring v. Arizona, 536 U.S. 584 (2002), Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). See Dkt. # 15 at 92. Respondent asserts that the OCCA's decision is entitled to deference and was not an unreasonable application of Supreme Court law.

Jackson's trial counsel argued strenuously that the great risk of death aggravating circumstance was not applicable in his case because the Decator child's injuries were far removed in time, place, and intent from the murder of Monica Decator. See Mot. Trans. 12/20/02 at 17-20. The trial court disagreed, and the jury found the existence of this aggravating circumstance, together with two other aggravators. On direct appeal, Jackson again argued that there was insufficient evidence to support the great risk of death aggravating circumstance because the incident involving injury to the Decator child and injuries which caused Monica Decator's death were not in close proximity in time, location, or intent. The OCCA reviewed its previous cases dealing with this issue, and noted that, "[i]n the majority of cases in which this aggravator has been upheld, the defendant either killed two or more people contemporaneously with the intent to kill all the victims or contemporaneously injured or killed one or more bystanders in the line of fire." Jackson, 146 P.3d at 1163-64 (citing by example over 25 Oklahoma cases involving an analysis of the aggravator). Although the OCCA noted that the circumstances in Jackson's case "are unlike those in any of our prior cases," the state appellate court did not rest its decision on the prior cases, finding instead:

> We need not decide the issue in this case, however. We conclude that even were we to find that Jackson's conduct here does not constitute the knowing creation of a great risk of death to more than one person, the submission of this aggravator to the jury did not skew the jury's decision to impose the death penalty. The United States Supreme Court recently set forth a test to determine when a death sentence must be set aside if an aggravating circumstance is invalidated. "An invalidated sentencing factor. . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravating scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884, 892, 163 L.Ed D.2d 723 (2006). If the jury could have properly considered the evidence used to support the invalidated aggravator anyway because it also supported a separate and valid aggravator, the death sentence will stand. The Court held that in such a situation the jury has not considered any improper evidence and has not weighed any improper aggravating evidence against the mitigating evidence in arriving at its sentence. *Id.*

The evidence that Jackson injured the child was relevant to support the aggravator that he committed the murder of Decator "to avoid arrest or prosecution." The gravity of the child's injuries, as detailed by the treating physician, showed that Jackson appreciated the seriousness of the child's condition and deliberately murdered the child's mother to avoid being held responsible. Hence, the "great risk of death" aggravator was not supported by any evidence that was not also admissible to support a separate aggravator. Thus even if the "great risk of death" aggravator was improperly applied in the current case, the jury's weighing process of mitigating evidence against aggravating circumstances was not skewed. This claim is rejected.

Jackson, 146 P.3d at 1164 (emphasis in original). Further, in its mandatory sentence review portion of the direct appeal opinion, the OCCA said, "The jury's finding of two aggravators is factually substantiated." Id. at 1168. No mention is made of the third aggravator, presumed to be the "great risk of death" aggravator. Because the OCCA did not specifically address the question whether there was sufficient evidence to support the great risk of death aggravator, this Court must only decide whether the OCCA's decision based on Brown v. Sanders was an unreasonable application of Supreme Court law.

The Sanders Court considered "the circumstances in which an invalidated sentencing factor will render a death sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the jury's weighing process." Sanders, 546 U.S. at 214. Sanders' jury found the existence of four "special circumstances,"[9] but two of the four were declared invalid by the California Supreme Court although his death sentence was affirmed. Id. at 214-15. Habeas relief on this issue was denied by the District Court, but the Ninth Circuit Court of Appeals reversed. Sanders v. Woodford, 373 F.3d 1054 (2004). Upon review and an extensive discussion of prior cases distinguishing between weighing and non-weighing states, the Supreme Court established new

---

[9]     The term "special circumstances" in California refers to eligibility factors for the death penalty in the same manner that "aggravating circumstances" is used in Oklahoma.

guidelines for reviewing sentence-invalidating factors. <u>Sanders.</u> 546 U.S. at 220. The <u>Sanders</u> test provides that, "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." <u>Id.</u> (emphasis in original). The Court concluded that all of the facts and circumstances considered by Sanders' jury for the two invalid aggravating circumstances were also aggravating facts bearing upon the two valid aggravating circumstances. Thus, they were properly considered by the jury and did not render the jury's sentencing verdict unconstitutional. <u>Id.</u> at 224-25. The OCCA reached a similar conclusion in Jackson's case and decided his death sentence was not rendered invalid because the jury considered the great risk of death aggravating circumstance which may have been improperly applied in his case.

Jackson provides extensive argument in support of his claim that the jury should not have been allowed to consider the great risk of death aggravating circumstance. However, the OCCA did not specifically disagree with Jackson's position. Instead, the OCCA relied on the standards set forth in the <u>Sanders</u> case to conclude that the submission of this aggravator to the jury did not skew its decision because evidence in support of the great risk of death aggravator was also pertinent to the "avoid arrest or prosecution" aggravator. Thus, the issue before this Court is whether the OCCA's decision was contrary to, or an unreasonable application of, the law set forth by the Supreme Court in <u>Sanders</u>.

Jackson argues that the OCCA's reliance on <u>Sanders</u> violates the constitutional standards set forth in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) (holding that the Arizona statute which allowed a trial

34

judge, sitting alone, to determine the presence or absence of aggravating factors in a capital case violated the Sixth Amendment right to a jury trial), and Apprendi v. New Jersey, 530 U.S. 466 (2000) (finding it "unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed."). He contends that the weighing of aggravating and mitigating circumstances is a factual finding that must be made by a jury, and thus it was error for the OCCA to reweigh the aggravating and mitigating circumstances when it decided not to address the sufficiency of evidence supporting the great risk of death aggravator.

However, the OCCA has rejected the argument that this is a factual finding and, instead, treats the weighing of mitigating and aggravating circumstances as a balancing process. See Torres v. State, 58 P.3d 214 (Okla. Crim. App. 2002); Revilla v. State, 877 P.2d 1143, 1153 (Okla. Crim. App. 1994). Federal courts considering this issue in habeas proceedings have consistently found that Oklahoma's sentencing procedures do not violate Apprendi or Ring, and have accepted the OCCA's characterization of the weighing of aggravating and mitigating circumstances as a balancing process. See e.g., Matthews v. Workman, 577 F.3d 1175, 1195 (10th Cir. 2009) (citing United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007) for the proposition that the weighing process is not a finding of fact subject to Apprendi). Further, the Supreme Court has stated that, "a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Kansas v. Marsh, 548 U.S. 163, 174 (2006).

Jackson has not demonstrated that the OCCA's decision upon reweighing the aggravating and mitigating circumstances, was an unreasonable application of Sanders, Ring, or Apprendi. He is not entitled to habeas corpus relief on his ground three claim.

IV.     **Jury instructions (ground four)**

In his fourth ground for habeas corpus relief, Jackson claims his constitutional rights were violated when the trial court failed to instruct the jury accurately. More specifically he asserts that the trial court (1) failed to give a second degree murder instruction; (2) failed to give a limiting instruction regarding evidence related to the Decator child's injuries; (3) failed to properly inform the jury regarding malice aforethought murder; (4) failed to instruct on the limitations of the Pardon and Parole Board; (5) failed to inform the jury that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt; (6) incorrectly instructed the jury regarding punishment if mitigating evidence were not found; and (7) misinstructed the jury regarding the heinous, atrocious or cruel (HAC) aggravating circumstance. This claim was presented to the OCCA on direct appeal, and rejected on the merits. Jackson contends that the OCCA unreasonably applied Supreme Court law. Respondent argues that the OCCA's denial of relief was not based on an unreasonable application of Supreme Court law.

In general, an argument that a jury instruction is incorrect under state law is not a basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991), and Hale v. Gibson, 227 F.3d 1298 (10th Cir. 2000). Habeas review must question "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. (citing McGuire, 502 U.S. at 72). Further, the instruction must be viewed in the "context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72 (citing Cupp v. Naughten, 414 U.S.141, 147 (1973) (recognizing that one instruction is but one of many instructions, and the instructions as a whole are but one of several components of a trial)).

*Failure to instruct on second degree murder*

Jackson first argues that the trial court erred in failing to instruct on the lesser included offense of second degree murder, resulting in a violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the Constitution.[10] Jackson contends that the second degree murder instruction was warranted because there was no evidence that he intended to kill the victim, Monica Decator.  In response, the Respondent declares that the OCCA's rejection of this claim was not contrary to established federal law as determined by the Supreme Court.

In considering Jackson's claims on direct appeal, the OCCA cited Oklahoma case law when it held:

> Jury instructions on lesser forms of homicide should be given if they are reasonably supported by the evidence. *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. To determine whether lesser-included offense instructions are warranted, this Court looks at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *Harris*, 2004 OK CR 1, ¶ 50, 84 P.3d at 750. Jackson contends the trial court necessarily determined that there was evidence to support a finding of "no design to effect death" when it decided the evidence supported a first degree manslaughter instruction. Because depraved mind murder also requires no premeditated design to effect death, he contends that the trial court also should have included this offense for the jury to consider.

> To warrant an instruction on depraved mind murder, the evidence must reasonably support the conclusion that the defendant committed an act so imminently dangerous to another person as to evince a depraved mind in disregard for human life, but without the intent of taking the life of a particular individual. *Harris*, 2004 OK CR 1, ¶ 49, 84 P.3d at 750; OUJI-CR2d 4-91. According to Jackson, he fought with Decator and stabbed her so she could not stab him. Jackson did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life *without* the intent of taking the life of any particular individual. His defense was one of imperfect self-

---

[10]    Jackson requested instructions on the lesser included offenses of second degree depraved mind murder and manslaughter. <u>See</u> O.R. Vol. X at 1723-26. The trial court allowed the manslaughter instruction but declined to give a second degree murder instruction. Tr. Trans. Vol. 15 at 32.

> defense. The evidence thus supported the trial court's decision to give instructions on self-defense and heat of passion manslaughter. The trial court did not err in refusing Jackson's request for second degree murder instruction.

Jackson, 146 P.3d at 1159-60.

The Due Process Clause of the Fourteenth Amendment ensures that "a sentence of death [may not] . . . be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Beck v. Alabama, 447 U.S. 625, 627 (1980). However, due process does not require the jury to be instructed on every non-capital lesser included offense supported by the evidence. Schad v. Arizona, 501 U.S. 624, 646 (1991) (explaining fundamental concern of Beck was to provide alternative for jury if only choices were capital punishment or set defendant free).  A jury may not be presented with an "all-or-nothing" decision when the evidence presents a third option. Id. As in Schad, the central concern of Beck is not implicated in the instant case because Jackson's "jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." Id.  In Jackson's trial, the jury was instructed on the non-capital crime of heat of passion manslaughter. It "was not faced with an all-or-nothing choice." Beck, 447 U.S. at 647.

Jackson's trial counsel requested a second degree murder instruction. O.R. Vol. X at 1723. Under Oklahoma law, second degree murder is committed, "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S. § 701.8. Jackson claims that he did not intend to kill Ms. Decator, but was acting in self-defense after she initiated the physical attack. See Dkt. # 15 at 106.

In this case, the only evidence relating to Jackson's claim that he was acting in self defense came from his own statements. Since the jury obviously did not believe Jackson's testimony that he was acting in self defense, the only other alternative clearly established a premeditated design to effect the death of Ms. Decator.  Upon examination of the Oklahoma statute defining Second Degree Murder, and in light of the facts of this case, this Court agrees with the state court that there was insufficient evidence to support a second degree murder instruction. Thus, the OCCA's decision was not contrary to federal law, nor did it involve an unreasonable application of the facts in light of the evidence introduced at trial. Accordingly, the trial court's refusal to give a second degree felony murder instruction did not constitute a violation of Jackson's constitutional rights. Relief is denied on this issue.

*Failure to give proper limiting instruction*

Jackson next complains that the trial judge gave an improper limiting instruction to the jury regarding evidence of the injuries of the Decator child.[11] Jackson contends, as he did at trial when requesting a limiting instruction, that the only "arguably" permissible use of this evidence was to prove that he had a motive to kill Monica Decator. In rejecting the claim on direct appeal, the OCCA found as follows:

> Next Jackson contends the trial court erred when it instructed the jury that it could consider the evidence concerning Jackson's injury to the child to show motive, intent, preparation, plan, absence of mistake, or accident. He argues that this evidence should have been limited solely to "motive" and that the use of the evidence without an appropriately narrow instruction permitted the jury to conclude that he was a criminal who acted in conformity with his character when he killed

---

[11]     To the extent Jackson also argues that the trial improperly admitted evidence of the Decator child's injuries, that argument will be addressed in the discussion of Jackson's ground seven claim.

Decator. The State argues that a limiting instruction was not required because the evidence concerning the injury to the child was part of the *res gestae*.

"Evidence is considered **res gestae** a) when it is so closely connected to the charged offense as to form part of the entire transaction, b) when it is necessary to give the jury a complete understanding of the crime, or c) when it is central to the chain of events." *Rogers v. State,* 1995 OK CR 8, ¶ 21, 890 P.2d 959, 971. Evidence that Jackson injured the child was necessary to give the jury a complete understanding of the crime and was central to the chain of events. It was inextricably entwined with the crime charged. Such evidence does not require a limiting instruction. *Bennett v. State,* 1987 OK CR 208, ¶ 18, 743 P.2d 1096, 1099. For that reason, Jackson cannot show any error resulting from the instruction given. No relief is required.

Jackson, 146 P.3d at 1160 (emphasis in original). Jackson's attorney asked the trial judge to delete all language following the word "motive" in the following proposed limiting instruction:

Instruction No. 17.

Evidence has been received that the defendant has allegedly committed misconduct or offenses other than that charged in the Information. You may not consider this evidence as proof of the guilt or innocence of the defendant of the specific offense charged in the Information.

This evidence has been received solely on the issue of the defendant's alleged motive, intent, preparation, plan, or absence of mistake or accident. This evidence is to be considered by you only for the limited purpose for which it was received.

Tr. Trans. Vol. 15 at 23. Although Jackson argues that the trial court's refusal to modify the instruction was a "misapplication of Okla. Stat. tit. 12, § 2404(B) (2001)," he provides no citations to Supreme Court law which would support his claim for habeas corpus relief. The Court finds that the OCCA's ruling on the claim was not an unreasonable application of Supreme Court law, and Jackson is not entitled to habeas relief on this portion of his ground four claim.

*Failure to inform the jury adequately regarding malice aforethought*

Jackson next claims that the trial court violated his constitutional rights by refusing to include his requested additional language to the jury instruction defining malice aforethought. The OCCA's decision provides a concise summary of Jackson's claim, and the rationale for denying relief, as follows:

> Jackson claims that the trial court erred in refusing his request to alter the definitional instruction of "malice aforethought" (OUJI-CR2d 4-62) to include a statement that the jury "may not presume the existence of the requisite intent from the fact of the slaying alone." He contends that without this addition to the uniform instruction, a danger exists in those cases where the defendant has admitted the homicidal act that the jury will shift the burden of proof to the defendant to disprove that the killing was intentional.

> Jury instructions are sufficient if when read as a whole they state the applicable law. The trial court gave the uniform instruction defining malice aforethought. It also gave the uniform instruction on the burden of proof, requiring the State to prove all the  elements of first degree murder, including malice aforethought, beyond a reasonable doubt. The fact that Jackson confessed to killing Decator did not relieve the State of its burden to prove that he intended to do so. The instructions given accurately stated the law and the trial court did not err in refusing Jackson's modified instruction.

Jackson, 146 P.3d at 1160. Jackson relies on Sandstrom v. Montana, 442 U.S. 510 (1979), and In re Winship, 397 U.S. 358 (1970) for his argument that "once the jury is convinced the defendant killed someone it might shift the burden of proof  to the defendant to disprove that it was done with malice aforethought." Dkt. # 15 at 115. In Sandstrom, however, the Supreme Court was considering whether the jury instruction stating that the "law presumes that a person intends the ordinary consequences of his voluntary acts" violates the Fourteenth Amendment's requirement that the State prove every element of a crime. Sandstrom, 442 U.S. at 512. No such instruction was given to Jackson's jury. To the contrary, Jackson's jury was specifically instructed as to elements of first

41

degree murder which included a finding of malice aforethought. O.R. Vol. X at 1786 (Instruction Number 3). They were further instructed as to the meaning of "malice aforethought." Id.  Finally, they were specifically instructed that the State was required to prove each element of the crime beyond a reasonable doubt. O.R. Vol. X at 1784 (Instruction Number 1). The Supreme Court's concern in Sandstrom about the presumption instruction based on Montana law is of no consequence to Jackson's case. Likewise, the very narrow question before the Supreme Court in Winship has no application to Jackson's issue. In re Winship addressed the "single, narrow question whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which could constitute a crime if committed by an adult." In re Winship, 397 U.S. at 359. Jackson provides no other citations to support his argument that the OCCA's decision was an unreasonable application of Supreme Court law. He is not entitled to habeas relief on this portion of his Ground Four claim.

*Failure to instruct regarding meaning of life without parole*

Jackson next claims that his due process rights were violated when the trial judge refused to instruct the jury that, if given a sentence of life imprisonment without the possibility of parole, he would never be considered for parole. Citing Simmons v. South Carolina, 512 U.S. 154 (1994), he argues that the OCCA's denial of this claim on direct appeal was an unreasonable application of Supreme Court law.

The Tenth Circuit has "repeatedly rejected attempts to apply *Simmons/Shafer* to Oklahoma's three-option sentencing scheme, absent highly unusual circumstances." See Ochoa  v. Workman, 452 Fed. Appx.718, 738 (10th Cir. 2011) (unpublished) (citing Welch v. Workman, 639 F.3d 980,

1005 (10th Cir. 2011) and collected cases therein).[12] As in Ochoa, Jackson's claim of constitutional error is foreclosed by Tenth Circuit precedent. He is not entitled to relief on this claim.

*Failure to properly instruct regarding the weighing process*

Next, Jackson argues that his jury was not instructed that it must find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. He contends that the questions whether aggravating circumstances outweigh mitigating circumstances implicates a factual finding that must be found beyond a reasonable doubt according to Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). Jackson's argument is not unique, and previously has been rejected by the Tenth Circuit. See Matthews v. Workman, 577 F.3d 1175, 1195 (10th Cir. 2009) and cases cited therein.  In Matthews, the circuit court explained that the jury's "determination that aggravating factors outweigh mitigating facts is not a finding of fact subject to Apprendi but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" Id.  Accordingly, Jackson's claim is foreclosed by Tenth Circuit precedent. The OCCA's rejection of this issue on the merits is not an unreasonable application of Supreme Court law, and Jackson shall be denied relief on this claim.

*Failure to properly instruct regarding punishment options*

In the next part of his ground four claim, Jackson complains that the instructions did not inform the jury that mitigating circumstances did not have to be found at all in order to impose a sentence less than death. He argues that, without such instruction, there was a reasonable likelihood

---

[12]  This and other unpublished decisions are cited herein as persuasive authority pursuant to Tenth Circuit Rule 32.1.

that the jury believed the death penalty was required if no mitigating factors were proven. The

OCCA denied relief on this claim in direct appeal, finding as follows:

> There is, however, no reason to conclude that the jury was misled by the instructions as Jackson speculates. The court instructed Jackson's jury that it could not impose the death penalty unless it found the existence of at least one aggravating circumstance beyond a reasonable doubt and further that the aggravating circumstance found outweighed any mitigating circumstances. The court identified sixteen mitigating circumstances for the jury to consider and told jurors that they could consider any other mitigating circumstance shown by the evidence. The court also instructed the jury that, even with a finding that aggravators outweigh mitigators, it was free to impose a sentence less than death. These instructions adequately stated the applicable law and did not mislead Jackson's jury or direct that the jury must impose the death penalty if it did not find any mitigating circumstances in the case. No relief is required.

Jackson, 146 P.3d at 1161. Jackson cites Woodson v. North Carolina, 428 U.S. 280 (1976) for his

claim that his Eighth Amendment rights have been violated. However, Woodson provides no support

because the Supreme Court in Woodson's case was ruling on the constitutionality of North

Carolina's law which made death the mandatory sentence for all persons convicted of first-degree

murder. Id. at 287. Nothing in the instructions given to Jackson's jury could be perceived as a

mandatory directive to impose the death penalty. The OCCA correctly summarized the instructions

given to the jury, and the state appellate court's denial of relief to Jackson on this claim was not an

unreasonable application of Woodson or any other Supreme Court law. Habeas relief shall be denied

on this sub-part of ground four.

*Improper instruction regarding HAC aggravator*

In the final part of ground four, Jackson argues that his constitutional rights were violated

because his jury was not instructed to find "conscious" physical or mental suffering in considering

the HAC aggravator. Jackson had proposed a more detailed instruction, but the trial court opted to

use the uniform instruction (OUJI-CR2d 4-73) in effect at the time without Jackson's proposed additional language. The uniform instruction was modified after Jackson's trial to include additional language similar to that proposed by Jackson. See DeRosa v. State, 89 P.3d 1124, 1156 (Okla. Crim. App. 2004). Jackson claims the earlier version of the instruction used at his trial was constitutionally inadequate, and relies on Ring v. Arizona, 536 U.S. 584 (2002), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004) to support his claim. He also alleges that his equal protection rights were violated because he was treated differently from those sentenced after the new instruction was modified in DeRosa. Jackson raised these complaints about the HAC instruction on direct appeal, but the OCCA denied relief. Respondent contends that the OCCA's decision was not an unreasonable application of Supreme Court law, and Jackson is not entitled to habeas corpus relief under AEDPA.

Rejecting this claim on direct appeal, the OCCA explained:

This Court recently published a case that forecloses Jackson's position. See Rojem, 2006 OK CR 7, ¶ 68-72, 130 P.3d at 300-01. Rojem challenged the uniform instruction, the same one given in Jackson's case, on the basis that it failed to inform jurors "of the requirement of finding inordinate conscious physical suffering." Rojem argued that the former version of the uniform instruction was inadequate because of the new instruction adopted by the Court in DeRosa and references therein to Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed.2d 556 (2002). We disagreed and stated:

There is no doubt the amended instruction is an improvement over the former and takes a cautious approach toward the concerns addressed in Ring. As Appellant notes, the instruction is "intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." DeRosa, 2004 OK CR 19, ¶ 96, 89 P.3d at 1156. That is, the instruction more fully informs and acts as a form of insurance.

But this does not mean the former instruction has suddenly became unconstitutional. Indeed, DeRosa plainly states it "should not be interpreted as a ruling that the former uniform instruction was legally

45

> inaccurate . . . Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis." Id., 2004 OK CR 19, ¶ 97, 89 P.3d 1124, 1155.
>
> Rojem, 2006 OK CR 7, ¶¶ 70-71, 130 P.3d at 301. *Rojem* is dispositive and we reject this claim.

Jackson, 146 P.3d at 1162 (emphasis in original). The OCCA also dismissed Jackson's equal protection claim, finding that the DeRosa instruction did not cure a defective instruction, but improved on an otherwise valid instruction. Id. at 1163. Because the earlier instruction was repeatedly found to be constitutional, Jackson had not shown that his equal protection rights were violated because he was sentenced under the older version of the HAC instruction. Id.

A similar argument was rejected by the Tenth Circuit in Wilson v. Sirmons, 536 F.3d 1064, 1108 (10th Cir. 2008), as follows:

> Finally, Mr. Wilson claims that the heinous, atrocious, or cruel aggravator was unconstitutional as applied because the jury instruction did not require a finding of "consciousness," though it did require the jury to conclude that there was "torture or physical abuse." R. Vol. II, Box 2, Jury Instruction 6, CR 4–73, at 370. Therefore, it did not sufficiently narrow the class of defendants eligible for the death penalty.
>
> To be acceptable under the Eighth Amendment, the aggravating circumstance must furnish a sentencer with a principled means of guiding its discretion. *See* Maynard v. Cartwright, 486 U.S. 356, 361–64, 108 S. Ct. 1853, 100 L. Ed.2d 372 (1988). The Tenth Circuit has routinely upheld the constitutionality of the heinous, atrocious, or cruel aggravator so long as it includes the "torture or serious physical abuse" limitation. *See, e.g.,* Workman, 342 F.3d at 1115; Romano, 239 F.3d at 1176; Thomas, 218 F.3d at 1226; Medlock, 200 F.3d at 1319; Moore, 195 F.3d at 1175–76; Smallwood, 191 F.3d at 1274. Nonetheless, Mr. Wilson argues that because the jury instruction did not include the "conscious suffering" requirement imposed by the Oklahoma courts, the aggravator was unconstitutionally vague.
>
> His argument is foreclosed by Workman. The Workman Court approved a jury instruction stating "[t]he phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." 342 F.3d at 1116. This is the same language used in Mr.

46

> Wilson's case. *See also* Walton v. Arizona, 497 U.S. 639, 654–55, 110 S. Ct. 3047, 111 L. Ed.2d 511 (1990) *overruled on other grounds by* Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed.2d 556 (2002); Hatch v. Oklahoma, 58 F.3d 1447, 1468–69 (10th Cir.1995) *overruled on other grounds by* Moore v. Marr, 254 F.3d 1235 (10th Cir.2001).
>
> Even if the jury instruction did not sufficiently narrow the jury's discretion, the state court can also perform this narrowing function on review. Walton, 497 U.S. at 654, 110 S. Ct. 3047. Here, the OCCA found that there was torture in the form of extreme mental anguish, which ensured that the aggravator was not unconstitutionally vague. Mr. Wilson argues that Ring, 536 U.S. at 589, 122 S.Ct. 2428, requires a jury to perform this narrowing. Whatever the merits of this argument in the future, Ring does not apply retroactively and so is inapplicable to his case.

Wilson, 536 F.3d at 1108.  In the case at hand, Jackson has failed to advance legal arguments that satisfy his burden of demonstrating that the OCCA's finding on this issue was an unreasonable application of Supreme Court law. The HAC instruction given to Jackson's jury was constitutionally sufficient, and the later modification to the instruction by the OCCA in DeRosa did not signify that use of the earlier version was unconstitutional. Jackson's due process and equal protection rights were not violated by the trial court's use of the uniform HAC aggravator instruction. He is not entitled to habeas corpus relief on this claim.

**V.    "Murder to avoid arrest or prosecution" aggravating circumstance (ground five)**

Jackson contends in ground five that there was insufficient evidence to support the "avoid arrest or prosecution" aggravator. He raised this claim on direct appeal. The OCCA denied relief after reviewing the merits. Respondent asserts that Jackson is not entitled to habeas corpus relief because he has failed to demonstrate that the OCCA's determination was an unreasonable application of Supreme Court law, or an unreasonable determination of the facts presented at trial.

When reviewing a constitutional claim that there was insufficient evidence, the Court must rely on the rational factfinder standard, established in Jackson v. Virginia, 443 U.S. 307, 319 (1979),

to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Foster v. Ward, 182 F.3d 1177, 1194 (10th Cir. 1999). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. The Tenth Circuit has emphasized that, under Jackson, review is "sharply limited" and a court "faced with a record of historical facts that supports conflicting inferences must presume - even it if does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Wright v. West, 505 U.S. 277, 296-97 (1992)). Here, the Court must consider whether the OCCA's decision that there was sufficient evidence to support the jury's finding of the "avoid arrest or prosecution" aggravator was contrary to or an unreasonable application of Jackson. 28 U.S.C. § 2254(d)(1); Spears v. Mullin, 343 F.3d 1215, 1238 (10th Cir. 2003).

In applying the Jackson standard, the Court looks to Oklahoma law. Under Oklahoma law, to support a finding of the "avoid arrest or prosecution" aggravating circumstance, "the focus is on the defendant's intent, whether proved by the defendant's own statement or through circumstantial evidence." Fox v. Ward, 200 F.3d 1286, 1301 (10th Cir. 2000). Further, Oklahoma law requires the existence of a predicate crime apart from the murder from which the defendant sought to avoid arrest or prosecution. See McGregor v. State, 885 P.2d 1366, 1385 (Okla. Crim. App. 1994).

In reviewing Jackson's claim on direct appeal, the OCCA concluded that there was sufficient evidence to support the avoid arrest or prosecution aggravator. In that regard, the OCCA reasoned that:

The evidence at trial supports the jury's finding that Jackson murdered Decator to avoid arrest for the separate, predicate crime of physically abusing her son. Jackson told police how he injured the child in the morning and early afternoon by beating him and shoving him to the floor. He started preparations to avoid criminal responsibility for injuring the child almost immediately. Before Decator got home from work, he hid the child under the vacant house, purchased gasoline to burn down the duplex, and emptied her bank account so he could leave town. Before he killed Decator, he told his mother that he, Decator and the boy were going to Louisiana. Jackson also told police that he did not call for aid for Decator because she would have reported him for injuring her son. Any rational jury could have found that the evidence presented during Jackson's trial was sufficient to establish the aggravating circumstance that the murder was committed to avoid arrest or prosecution.

Jackson, 146 P.3d at 1165. As an initial matter, the Court notes that the OCCA used the correct standard, specifically stating, "[w]e review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support this aggravating circumstance beyond a reasonable doubt." Id. The evidence clearly showed that Monica Decatur was murdered so Jackson could avoid prosecution for the injuries he inflicted on her child. Petitioner has failed to demonstrate otherwise.

This Court finds that the OCCA's determination that there was sufficient evidence to support the avoid arrest or prosecution aggravator was not an unreasonable application of Jackson. Petitioner is not entitled to habeas corpus relief on his ground five claim.

## VI.    Statements to law enforcement (ground six)

In ground six, Jackson claims his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to due process were violated when the trial court admitted statements he made to law enforcement. On direct appeal, he challenged the admission of statements made by him at four (4) different times on April 8, 1997. However, the focus of Jackson's ground six habeas claim centers on the responses he gave to police officers soon after he was placed into custody in

McAlester, but prior to being warned of his <u>Miranda</u> rights.[13] The officers were inquiring about the location of Monica Decator's child. Jackson contends that his answers were not made voluntarily as he believed that he had no choice but to talk to the men. He argues that his statements should not have been admitted at trial because he was not advised of his <u>Miranda</u> rights before answering the officers' questions regarding the Decator child.

On direct appeal, the OCCA reviewed the law and rationale of the trial court's decision to allow Jackson's statements under the "public safety exception" to the <u>Miranda</u> rule recognized by the Supreme Court in <u>New York v. Quarles</u>, 467 U.S. 649 (1984). The public safety exception allows police officers, under certain circumstances, to postpone advising a suspect of his <u>Miranda</u> rights if the questions are necessary to secure their safety or the public's safety. In Jackson's case, the trial court decided that the facts justified use of the "public safety exception."  However, the OCCA found that the "rescue doctrine"[14] recognized by some courts, such as <u>People v. Modesto</u>, 398 P.2d 753 (Cal. 1965) and <u>People v. Riddle</u>, 83 Cal. App.3d 563 (Cal. Ct. App. 1978), was more appropriate to Jackson's situation to excuse <u>Miranda</u> compliance because of an overriding need to save a human life or to rescue a person whose life is in danger. <u>Jackson</u>, 146 P.3d at 1158-59. Thus, the OCCA concluded that the trial court did not err in employing an exception to <u>Miranda</u> under the

---

[13]     <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[14]     The OCCA has recently affirmed its adoption of the rescue doctrine as an exception to <u>Miranda</u> requirements. In <u>Underwood v. State</u>, 252 P.3d 221 (Okla. Crim.  App. 2011), the court found that, "[t]he rescue doctrine is a recognition that the exigencies of some situations – such as the imminent need to save human life – should forgive, or at least delay, strict compliance with <u>Miranda</u>. It is a natural and logical extension of the 'public safety exception' to the <u>Miranda</u> rule, recognized by the United States Supreme Court in <u>New York v. Quarles</u>, 467 U.S. 649 (1984)." <u>Id.</u> at 236. Other courts have labeled this extension to the <u>Miranda</u> exception as a "private safety exception." <u>See</u> <u>Benson v. State</u>, 698 So.2d 333, 335 (Fla. Dist. Ct. App. 1997); <u>State v. Kunkel</u>, 137 Wis.2d 172, 188-89 (Wis. Ct. App. 1987).

limited circumstances of the case. Id. at 1159. Jackson asserts that the OCCA extended the public safety exception to the facts of his case, in violation of his rights under Miranda.

The State does not contest that Jackson was in custody while he made the statements concerning the location of the Decator child. Nor is there any doubt that the officers questioned Jackson about this matter before they read him his rights under Miranda. The Court agrees with the concept of a "rescue doctrine" or "private safety" exception to Miranda because the police should not be required to choose between forfeiting the opportunity to save an individual from possible and imminent loss of life (in this case, O.D.) and forfeiting the right to obtain evidence from a suspect in custody. Nonetheless, the Court has been unable to locate any Supreme Court citation supporting this "rescue doctrine" or "private safety" extension of the Quarles exception to Miranda. In Jackson's case, however, even if there were a Miranda violation, the police officers' questions regarding the location of O.D were harmless.

A sua sponte harmless-error review is appropriate, and inexorably leads to the conclusion that the admission of Jackson's pre-Miranda statements concerning the location of O.D. did not have a "substantial and injurious effect" on the trial. Brecht v. Abrahamson, 507 U.S. 619 (1993).

> "The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination . . . [is] subject to harmless-error analysis under our cases." *Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (citations omitted); *see also Arizona v. Fulminante,* 499 U.S. 279, 306–12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (applying harmless error analysis to confession coerced in violation of Fifth Amendment); *United States v. Perdue,* 8 F.3d 1455, 1469 (10th Cir. 1993) (applying harmless error analysis to admission of statement made in violation of *Miranda* ); *see also, e.g., Tankleff v. Senkowski,* 135 F.3d 235, 245 (2d Cir. 1998) (applying harmless beyond a reasonable doubt standard to erroneous admission of inculpatory pre- *Miranda* statements).

United States v. Hudson, 102 Fed.Appx. 127, 134 (10th Cir. 2004) (unpublished).

After carefully reviewing the record, the Court concludes there was ample other evidence, besides the statements to police regarding the whereabouts of the Decator child, supporting Jackson's conviction for first degree murder. Among other evidence, the jury heard Jackson's highly incriminating post-Miranda statements in which Jackson admitted to hitting Monica Decator with a brick and stabbing her with a knife. The fact that the jury heard that Jackson assisted the police in locating the child would have made little difference in the jury's assessment of the evidence supporting the murder conviction. The Court concludes that "the 'minds of an average jury' would not have found the [prosecution's] case significantly less persuasive had the testimony of [Jackson's statements to the police] been excluded." Schneble v. Florida, 405 U.S. 427, 432 (1972).   The admission of Jackson's co-operative statements helping the police officers locate O.D., even if erroneous under Miranda, was harmless error. Jackson has not shown that he is entitled to habeas relief on his ground six claim.

## VII.   Inflammatory, irrelevant and prejudicial evidence (ground seven)

In ground seven, Jackson contends that the admission of certain evidence at his trial was a violation of his rights to due process and a reliable sentencing proceeding. Specifically, Jackson challenges the admission of:  (1) evidence related to the Decator child, including pictures of the crawl space where the child was found; (2) second stage evidence related to injuries suffered by the Decator child; and (3) photographs of the murder victim. Jackson concedes that state law evidentiary errors do not rise to the level of a violation of constitutional rights unless the errors fatally infected the trial, resulting in a fundamentally unfair proceeding. See Dkt. # 15 at 153. He cites Bruton v. United States, 391 U.S. 123, 131 (1994), for the proposition that an "important element of a fair trial is that a jury consider only relevant and competent evidence." Id.

52

Jackson is entitled to habeas relief only if his alleged errors were "so grossly prejudicial that [they] fatally infected the trial and denied the fundamental fairness that is the essence of due process." Willingham v. Mullin, 296 F.3d 917, 928 (10th Cir. 2002). Furthermore, "[f]ederal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005). The Court must, therefore, review the OCCA's resolution of this claim to determine whether its decision is a reasonable application of federal due process principles. In this context, federal relief under the Due Process Clause of the Fourteenth Amendment  will be granted "only if the probative value of [the challenged] evidence is . . . greatly outweighed by the prejudice flowing from its admission." Welch v. Sirmons, 451 F.3d 675, 688 (2006), *overruled on other grounds* by Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009).

Respondent states that Jackson's ground seven claims were reviewed on the merits by the OCCA in direct appeal proceedings, and rejected. Further, he claims the OCCA's decision was not contrary to, or an unreasonable application of, Supreme Court law.

*Jackson's statements to law enforcement*

Jackson argues that his statements to police in which he described the injuries he inflicted on the Decator child should not have been entered into evidence because they were irrelevant and more prejudicial than probative as to the murder of Monica Decator. The OCCA did not agree, finding as follows:

> Jackson first complains that the trial court erred in admitting the first part of his recorded statement to police (consisting of the first 19 pages of State's Exhibit 54 and the corresponding portion of the videotape) detailing the abuse he inflicted on the child. Evidence is admissible if it is relevant and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

> The trial court ruled that this part of Jackson's statement was relevant
> and not unfairly prejudicial because it helped explain the events
> leading up to the murder and was necessary for the jury to understand
> the theories of both the State and the defense. The trial court did not
> allow the State to present evidence during the first stage about the
> extent of the child's injuries. The statements made by Jackson about
> the circumstances of his injuring the child provided evidence of his
> motive for killing Decator and explained his later actions. This
> evidence was an integral part of this case and the trial court did not
> err in admitting the challenged evidence, including the portion
> relating to the child.

Jackson, 146 P.3d at 1165 (internal citation omitted). Respondent contends that the OCCA's ruling

was correct because the beating of the child and murder of his mother were inextricably intertwined.

Jackson is correct in noting that state law evidentiary rulings do not rise to the level of a

constitutional violation unless they render the proceeding fundamentally unfair. See Payne v.

Tennessee, 501 U.S. 808, 825 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 179-83 (1986)).

Jackson has not demonstrated, however, that his trial was rendered fundamentally unfair by the

admission of his statements to police. He has failed to convince the Court that the OCCA's

determination of this issue was contrary to, or an unreasonable application of, Supreme Court law.

Accordingly, habeas relief shall be denied on this portion of his ground seven claim.

*Crawlspace photos*

Jackson challenges the admission of several photographs and a drawing depicting the crawl

space where he had hidden the Decator child. He claims the exhibits were irrelevant, unfairly

prejudicial, and cumulative to the testimony of the police officers who found the child. The OCCA

rejected this claim on direct appeal, finding as follows:

> These exhibits were neither unfairly prejudicial nor cumulative. The
> State's theory was that Jackson intended to kill Decator so that she
> could not report him for injuring her son. The lengths that Jackson
> went to in order to hide the boy so no one would find him as

54

> demonstrated by these exhibits tended to support the State's theory
> that he killed Decator so she could not notify the police and so he
> could get away. This evidence also refuted Jackson's statement that
> he wanted the child to be found, casting doubt on the truth of his
> entire statement.

Jackson, 146 P.3d at 1165-66. Jackson contends that the admission of these exhibits "fatally infected" his trial, but this conclusory argument is insufficient to establish that the OCCA's ruling was contrary to, or an unreasonable application of, Supreme Court law. The Court need not accept "mere conclusions characterizing pleaded facts." See Bryson v. City of Edmond, 905 F.2d 1386, 1390 (10th Cir. 1990). Jackson is not entitled to habeas relief on this claim.

*Testimony of child's doctor*

Petitioner objects to the second stage testimony provided by the physician who treated the Decator child after he was found. He argues that the doctor's detailed description of the child's injuries was cumulative and overly prejudicial. He also claims that the testimony was irrelevant and unnecessary, particularly because the trial judge decided to strike the continuing threat aggravating circumstance. The OCCA found the testimony was properly admitted for the following reasons:

> The doctor described the numerous blunt force injuries sustained by
> the child and the near fatal brain swelling that resulted from the
> blows. He also described injuries on the child's neck associated with
> strangulation. . . [T]he doctor's testimony was relevant to prove the
> "avoid arrest" aggravator. It tended to prove that Jackson would have
> known and appreciated the seriousness of the child's condition and
> likely murdered the child's mother so that she could not report him.
> The probative value of the doctor's testimony was not outweighed by
> the danger of unfair prejudice and the trial court did not err in
> admitting it.

Jackson, 146 P. 3d at 1166. Although Jackson details the allegedly objectionable testimony, he fails to provide any citations to Supreme Court law to support his claim that he is entitled to habeas relief.

55

Further, the Court does not find that the OCCA's decision was contrary to, or an unreasonable application of, Supreme Court law. Habeas relief shall be denied on this claim.

*Photos of victim*

Jackson next makes a brief, cursory argument that the trial court improperly admitted into evidence several gruesome photographs of the murder victim, violating his rights to due process and a reliable sentencing. The OCCA rejected this claim on direct appeal, finding as follows:

> These photographs were probative because they assisted the jury in understanding the medical examiner's testimony and in understanding the State's theory of how the crime occurred. They also corroborated parts of Jackson's confession. Each of the photographs showed a different aspect or view of the various wounds Decator sustained. Their probative value was not substantially outweighed by the danger of needless presentation of cumulative evidence; nor were the photos unfairly prejudicial. The photos show the victim and the wounds she sustained during her attack. They are not gratuitously shocking and they depict her killer's handiwork. It did not violate due process to show them to Jackson's jury.

Jackson, 146 F.3d at 1166. Jackson has not demonstrated that admission of the photographs was so unduly prejudicial as to render his proceedings fundamentally unfair. See Smallwood, 191 F.3d at 1274. The OCCA's decision was not an unreasonable application of Supreme Court law. Thus, habeas relief shall be denied on this claim.

## VIII.   Victim impact evidence (ground eight)

Jackson next claims that his rights guaranteed by the Eighth and Fourteenth Amendments were violated by victim impact evidence introduced during the penalty phase of his trial. He first argues that the victim impact statements presented by the victim's sisters and mother were unfairly prejudicial because they focused almost entirely on the emotional impact of the murder of the victim's family. He also claims that victim impact evidence in the Oklahoma sentencing scheme acts

as an improper "super aggravator" and is unconstitutional.  The OCCA denied these claims of error

on direct appeal.

*Statements by victim's family*

At the end of the State's case in the second stage proceedings, the victim's four sisters,

Bridgette Watson, Christy Watson, Samantha Watson, and Annette Watson each read their prepared

victim impact statements into the record. <u>See</u> Tr. Trans. Vol. 16 at 165-76. Additionally, the

transcript of testimony by Mary Decator, the victim's mother, was read to the jury. <u>Id.</u> at 180-85.

Jackson asserts that the statements were unfairly prejudicial and exceeded the limits for victim

impact testimony established in <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991).

Bridgette Watson told the jury about her close relationship with her sister, and how the

murder adversely affected her marriage and her outlook about men. Tr. Trans. Vol. 16 at 165-66.

Christy Watson described how close she was to her sister and how much she missed her. <u>Id.</u> at 169.

Samantha Watson told the jury how much she loved her sister and how much she missed her. <u>Id.</u> at

172-73. Annette Watson stated that she looked up to her older sister, and was depressed and fearful

after the murder. <u>Id.</u> at 174-76. Mary Decator, the victim's mother, described how she cried every

day and how taking care of the victim's child had adversely affected her finances. <u>Id.</u> at 180-85.

The OCCA found that these victim impact statements were within the guidelines established

by the Oklahoma statutes and <u>Payne</u>, and denied relief. Federal habeas corpus review of the

admission of victim impact evidence is limited to a determination whether the use of the victim

statement made the sentencing hearing "so fundamentally unfair as to deny him due process."

<u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 645 (1974); *accord*, <u>Payne</u>, 501 U.S. at 825. In reviewing

the victim impact statements made by the victim's four sisters and mother, this Court does not find

57

the remarks so infected the sentencing proceeding as to render it fundamentally unfair.  Jackson has failed to demonstrate how the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, habeas relief is denied on this issue.

*Constitutionality of victim impact evidence as applied in Oklahoma*

Jackson next asserts that victim impact evidence in Oklahoma is not relevant to Oklahoma's "death penalty scheme" which requires a balancing test of aggravating and mitigating circumstances. (Dkt. #15 at 167). He claims it operates as a non-statutory "super aggravator" resulting in an unconstitutional skewing of the weighing process between aggravating and mitigating circumstances. Id.  This claim was raised on direct appeal. In rejecting Jackson's arguments, the OCCA stated:

> Jackson also argues that victim impact evidence "operates as an irrelevant, improper, non-statutory, 'superaggravator' that will always be present in every capital case." This claim has been raised repeatedly and rejected. *DeRosa*, 2004 OK CR 19, ¶ 83, 89 P.3d at 1152-53. We need not reexamine the issue here, especially since Jackson's jury was properly instructed on the proper and limited role of victim impact evidence. These claims are denied.

Jackson, 146 P.3d at 1167.

If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no *per se* bar. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."  Payne, 501 U.S. at 827. In overruling its own previous split decisions in Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), the Supreme Court observed that, "assessment of the harm caused by the defendant has

58

long been an important factor in determining the appropriate punishment, and victim impact evidence is simply another method of informing the sentencing authority about such harm." <u>Payne</u>, 501 U.S. at 808. Noting that in most cases, "victim impact evidence serves entirely legitimate purposes," the <u>Payne</u> Court concluded that such statements are "simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by the sentencing authorities." <u>Id</u>. at 825.

In 1992, Oklahoma enacted legislation permitting victim impact evidence. <u>See</u> Okla. Stat. tit. 21, § 701.10 (c) (1992)[15] and Okla. Stat tit. 22, §§ 984, 984.1 (1992).[16] Jackson does not challenge the constitutionality of the Oklahoma statutes or the admission of victim impact statements *per se*, but asserts that the statements have no place in Oklahoma's balancing scheme. (Dkt. #15 at 167).

Jackson's concern about the jury's possible misuse of victim impact evidence in its deliberations is based upon mere speculation. Jackson's jury was fully instructed as to its duties for determining punishment in the second stage proceedings and their consideration of victim impact evidence. (O.R. Vol. X at 1812-24). Jackson's assumption that his jury considered the victim impact evidence to be another aggravating circumstance ignores the plain language of the instructions given

---

[15]     Section 701.10 (c)  of Title 21 provides, "In the sentencing proceeding, . . . the state may introduce evidence about the victim and about the impact of the murder on the family of the victim."

[16]     Section 984 of Title 22, in effect at the time of Jackson's crime and trial, defines "victim impact statements" as, "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." Under section 984.1, copies of the victim impact statement are to be made available to the parties.

at trial, which the jury is presumed to follow. His jury found the existence of three aggravating circumstances beyond a reasonable doubt before recommending the death sentence for Jackson.

Additionally, the Supreme Court has determined that aggravating circumstances give effect to constitutional protections by narrowing the class of death eligible murders, and the introduction of victim impact evidence does not eliminate that effect. Tuilaepa v. California, 512 U.S. 967, 979-80 (1994). "[T]he sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." Id. (internal quotations omitted). "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." Id. at 979. This Court finds that the use of victim impact evidence in general under Oklahoma law and specifically in Jackson's trial did not deprive him of his Eighth Amendment or Fourteenth Amendment rights. The OCCA's decision on this issue in Jackson's direct appeal was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Habeas relief is denied on this issue.

## IX. Request for continuance (ground nine)

Jackson's ninth ground mirrors Proposition Two from his post-conviction application. He claims the trial judge violated his constitutional rights to a fair trial when he denied Jackson's request for a continuance in order to bring Dr. Merikangas back to court for surrebuttal testimony. He also contends that trial counsel was constitutionally ineffective for failing to object to the trial court's ruling, and appellate counsel was ineffective for failing to raise the claim on direct appeal.

Citing Okla Stat. tit. 22, § 1089(D)(4)(b)(1), the OCCA denied relief on the first portion of this claim, finding it waived because Jackson could have presented it on direct appeal. The OCCA

60

then reviewed the ineffective assistance of counsel portion of the claim according to <u>Strickland</u>,

denying relief on the merits as follows:

> At Jackson's request, one of his attorneys asked the court for a continuance to present surrebuttal after the State presented Dr. Carstens in rebuttal. When the court inquired about the need for a continuance, counsel said that Jackson wanted to recall Dr. Merikangas who was then in Washington, D.C.; he said he did not know when the doctor would be available. The court denied Jackson's request for a continuance and both sides rested. Afterwards, the court made further inquiry about Jackson's reasons for requesting a continuance. Defense counsel explained that Dr. Merikangas could challenge the findings of Dr. Carstens. The trial court judge noted that Dr. Merikangas had already testified about his findings and opinion and that Dr. Carstens had been called to rebut that testimony. The court explained that surrebuttal is not for the purpose of recalling a witness to repeat his testimony. Counsel made no showing of what, if any, new testimony Dr. Merikangas could give. The court affirmed its ruling denying Jackson's request for a continuance.

> Jackson has failed to affirmatively prove prejudice resulting from the performance of either trial or appellate counsel. *See Strickland*, 466 U.S. at 603, 104 S. Ct. at 2067; *Hood v. State*, 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. We cannot find, based on the record, a reasonable probability of a different outcome had trial counsel better argued for a continuance or had appellate counsel raised the continuance issue on appeal. This claim is denied.

<u>See</u> Opinion Denying Application for Post-Conviction Relief, filed March 27, 2008, in OCCA Case

No. PCD-2003-670. Significantly, Jackson was not denied the opportunity to present the testimony

of Dr. Merikangas. He complains that his due process rights were violated because the trial judge

denied his request for a continuance until Dr. Merikangas could return to court for surrebuttal

testimony.

The matter of continuance is traditionally within the discretion of the trial judge, and not

every denial of a request for more time constitutes a violation of due process. <u>See</u> <u>Ungar v. Sarafite</u>,

376 U.S. 575, 589 (1964). A district court's denial of a continuance will not be seen as a denial of

due process unless it is "arbitrary," e.g., "a myopic insistence upon expeditiousness in the face of

a justifiable request for delay." <u>Id.</u> The Tenth Circuit has stated that "when a denial of a continuance

forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion, but it must have been so arbitrary and fundamentally unfair that it violated constitutional principles of due process." Case v. Mondragon, 887 F.2d 1388, 1396 (10th Cir. 1989) (quoting Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. 1981)). Jackson has cited no Supreme Court case that would support his claim that his due process rights were violated. Nor has he provided any facts that might have been revealed if Dr. Merikangas would have returned to give surrebuttal testimony. He has not demonstrated that his constitutional rights were violated by the trial court's denial of his request for a continuance. Because his constitutional rights were not violated by the court's denial, neither his trial counsel nor his appellate counsel was constitutionally ineffective for failing to raise this issue. Jackson has not demonstrated that he is entitled to habeas corpus relief on this claim.

## X.    Ex parte meetings with trial judge (ground ten)

In his tenth ground for relief, Jackson presents a two-part argument challenging the constitutionality of certain ex parte meetings he had with the trial judge. First, he claims that the meetings were a violation of his right to counsel, and constituted structural error entitling him to relief. Further, he argues that his trial counsel was ineffective for not challenging the ex parte meetings. Jackson first raised these issues in his application for post-conviction relief. Respondent contends that the OCCA's denial of relief was not contrary to, or an unreasonable application of, Supreme Court law.

During his retrial, Jackson met with the trial judge several times without his counsel present. Jackson asserts that this was a structural error resulting in a violation of his constitutional rights. Citing Okla. Stat. tit. 22, § 1089(4)(b)(1), the OCCA concluded that this claim was waived because

it could have been raised on direct appeal. The procedural bar imposed by § 1089 provides that only matters which were not and could not have been raised in direct appeal can be raised during post-conviction review. Typically, a defaulted claim cannot be reviewed by this Court unless Jackson establishes either (a) cause and prejudice from his failure to raise the claim on direct review, or (b) a fundamental miscarriage of justice resulting from this Court's failure to review. Coleman, 501 U.S. at 750. However, in the interest of efficiency, the Tenth Circuit has held that deciding procedural bar questions can be avoided where claims can readily be dismissed on the merits. Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007). This Court will review the merits of his claim regarding the constitutionality of the ex parte meetings. Because Jackson contends his trial counsel was ineffective for failing to object to the ex parte meetings, the merits of the underlying claim must be addressed in any event.

Jackson summarizes the questionable ex parte meetings between the trial judge and himself, as follows:

1.  Pre-trial hearing held on February 21, 2003 - Jackson's attorney discussed both first and second stage trial strategy with the court. The judge asked Jackson if he understood and agreed with the strategy. Because Jackson did not agree fully with second stage strategy, the trial judge met with him separately to confirm the reasons for Jackson's disagreement with second stage trial strategy. See Mot. Trans. 2-21-03 at 24-25.

2.  March 24, 2003 - Jackson was unhappy with one of his trial attorneys (Craig Corgan) and asked to speak to the judge outside of his presence. Tr. Trans. Vol XV at 138-67.

3.  March 25, 2003 - Jackson had concerns about his attorneys' decision not to impeach his mother regarding inconsistent testimony. Tr. Trans. Vol. XVI at 237-59.

4.    March 26, 2003 - Follow-up ex parte meeting to confirm with Jackson that his decision the day before had not changed. Tr. Trans. Vol. XVII at 3-10.

5.    March 26, 2003 - Following testimony by Jackson in open court, the trial judge wanted to confirm, in private, that Jackson's decision not to testify was made without any undue pressure from counsel or others.  Id. at 158-62.

See Dkt. # 15.

Jackson first alleges that his ex parte communications constituted structural error. A constitutional error is either structural or it is not. Neder v. United States, 527 U.S. 1, 14 (1999). However, it is first necessary to find constitutional error before categorizing it as structural or not. A structural error affects the entire conduct of the trial from beginning to end. Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991) (recognizing that the total deprivation of the right to counsel or an impartial judge are examples of structural error). Some Sixth Amendment violations are structural error, while others are subject to harmless error analysis. United States v. Lott, 433 F.3d 718, 722 (10th Cir. 2006). The Circuit Court noted the following:

In Satterwhite v. Texas, the Supreme Court explained that Sixth Amendment structural error exists when "the deprivation of the right to counsel affect[s]-and contaminate[s]-the entire criminal proceeding." 486 U.S. 249, 257, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); see also Penson, 488 U.S. at 88-89, 109 S.Ct. 346 (complete denial of counsel on appeal); Holloway v. Arkansas, 435 U.S. 475, 490-91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (conflict of interest in representation throughout entire proceeding); White v. Maryland, 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (absence of counsel from preliminary hearing where guilty plea was later admitted at trial); Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of counsel throughout entire proceeding); Hamilton v. Alabama, 368 U.S. 52, 55, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (absence of counsel from arraignment where defenses not asserted were irretrievably lost). Sixth Amendment violations that do not pervade the entire proceeding, on the other hand, are subject to harmless error review. See Coleman v. Alabama, 399 U.S. 1, 9-10, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (absence of counsel at preliminary hearing but prosecution prohibited from using anything that occurred at the hearing at trial); Satterwhite, 486 U.S. at 258, 108 S.Ct. 1792

(admission of psychiatric testimony at capital sentencing obtained in violation of Sixth Amendment); <u>Moore v. Illinois</u>, 434 U.S. 220, 232, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) (admission of pretrial, corporeal identification made without counsel present); <u>Milton</u>, 407 U.S. at 377-78, 92 S.Ct. 2174 (admission of confession obtained without counsel).

<u>Id.</u> at 722 -23. None of the ex parte communications cited by Jackson contaminated his entire trial proceedings. His right to counsel was not denied for the entire trial. Thus, the instances complained of by Jackson do not constitute Sixth Amendment violations which were structural error, and shall be reviewed for harmlessness.

Because he claims that these ex parte conferences constituted structural error, Jackson provides no argument to explain how he might have been harmed or prejudiced by the meetings. However, having previously determined that structural error did not occur, the Court next looks to see if the ex parte meetings rose to the level of constitutional error at all. Upon careful review of the transcripts covering each of the alleged instances of error, the Court concludes that the ex parte meetings did not rise to the level of a constitutional error. In each case, either the attorney specifically asked the trial court to conduct a private inquiry of Jackson, or the judge was simply reaffirming in the ex parte meeting that Jackson's position had not changed from what he had said in open court. Most of the meetings concerned Jackson's opinions about the trial strategy being used by his attorneys. Further, in each instance it is clear that Jackson's attorneys were fully aware of what was being discussed in the ex parte communications. The Court finds that Jackson's constitutional rights were not violated by the ex parte meetings with the trial judge.

Having found no constitutional error because of the ex parte meetings, the Court also finds that Jackson's trial counsel was not ineffective for failing to object to the meetings. On post-conviction, the OCCA stated that Jackson did not show "that his trial attorneys were ineffective for

allowing him to participate in these meetings under the standards set forth in *Strickland v. Washington*." <u>See</u> Dkt. # 15, Appendix, attachment 1 at 12. The OCCA's decision that Jackson's trial attorneys were not ineffective for allowing him to participate in these meetings under the standards set forth in <u>Strickland</u> is entitled to AEDPA deference. Jackson has not shown that the state court's decision was contrary to, or an unreasonable application of, <u>Strickland</u>. He is not entitled to habeas relief on this claim. 28 U.S.C. § 2254 (d).

## XI.     Absence of trial judge during video presentation (ground eleven)

Jackson next argues that the trial judge's absence from the courtroom during the playing of Jackson's videotaped statement to police denied him a fair trial before an impartial judge. Further, he contends that his trial counsel was constitutionally ineffective for agreeing to the judge's absence. Raised for the first time in post-conviction proceedings, the first part of the claim was deemed waived and the ineffective assistance of counsel claim was denied based on <u>Strickland</u>.

A trial judge's presence during a criminal trial is an integral component of a defendant's constitutional right to a fair trial. <u>See</u>, <u>e.g.</u>, <u>Riley v. Deeds</u>, 56 F.3d 1117, 1119 (9th Cir. 1995) ("The presence of a judge is at the 'very core' of the constitutional guarantee of trial by an impartial jury."). However, a judge's absence from the courtroom is not structural error in every case. <u>United States v. Solon</u>, 596 F.3d 1206 (10th Cir. 2010) (leaving for another time the decision whether a judge's absence from the bench might constitute structural error in a case where the facts indicate a "complete abdication of judicial control over the process").

In Jackson's case, the trial judge had conducted a hearing prior to trial on the admissibility of Jackson's videotaped statement to police. During trial, the judge reviewed the tape and the

transcript accompanying the video. Tr. Trans. Vol. XII at 7. Before the tape was presented to the

jury as evidence, the following colloquy occurred:

COURT: All right. I'll have the jurors brought in. We'll be in recess.

\

     Also, one other thing, I have had the opportunity to review the videotape, as well as the – as well as this transcript.

     Are you guys needing me to be in the courtroom during this hour proceeding while the tape is played; state?

STATE: No, Your Honor.

COURT: Defense? If you want me here, I'll stay here.

DEFENSE: No, Judge, it's not necessary.

Tr. Trans. Vol. XIII at 4-5. Then, right before the tape was played, defense counsel volunteered that

the court reporter was not needed because a transcript was already available for the tape. Further,

he indicated that the judge could leave if he had other matters to attend to while the tape was

playing. Id. at 35. The record does not reveal whether the judge, while absent from the bench,

remained within hearing and sight of counsel or where he might have been. Although Jackson does

not contend that any objections were made during the playing of the videotape or that he was

prejudiced in any way by the judge's absence, the Court, nonetheless, finds that constitutional error

occurred when the judge left the courtroom during the playing of the videotape evidence.

However, based on the facts of this case, the judge's absence in Jackson's case did not rise

to the level of structural error.  Accordingly, the trial error is subject to harmless error review. Solon,

596 F.3d at 1212. The prejudicial impact of a constitutional error in a state court criminal trial must

be assessed under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson,

507 U.S. 619 (1993). <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121 (2007).  Jackson has not demonstrated, and the Court cannot find, that the trial judge's absence had such an effect on the jury's decision.

Jackson also claims that his trial counsel was constitutionally ineffective for not objecting to the judge's absence from the courtroom. Citing <u>Strickland</u>, the OCCA found that Jackson's trial attorneys were not ineffective in agreeing to the judge's absence from the courtroom. <u>See</u> Dkt. # 15, Appendix, attachment 1 at 13. Jackson has not demonstrated that the OCCA's ruling was contrary to, or an unreasonable application of, <u>Strickland</u>. Accordingly, he is not entitled to habeas corpus relief on his ground eleven claims.

## XII.    Lethal injection protocol (ground twelve)

In ground twelve, Jackson challenges Oklahoma's lethal injection protocols. In a brief three sentences, Jackson states that his Eighth and Fourteenth Amendment rights "will be" violated if executed, that he includes the claim in order to preserve the issue, and that his appellate counsel was ineffective for failing to raise the claim on appeal. He provides no other argument or citation to legal authority. Despite the fact that the OCCA ruled on the merits of this claim in Jackson's post-conviction proceeding, he fails to explain how the state court's decision was an unreasonable application of Supreme Court law. Respondent urges the Court to deny relief as the OCCA's decision on the merits is entitled to deference. Jackson did not address the issue at all in his reply. (Dkt. # 30).  Because Jackson provides no authority or argument to sustain his burden under AEDPA to show that the OCCA's denial of relief resulted in an unreasonable application of Supreme Court law, or an unreasonable determination of facts, relief on his undeveloped ground twelve claim shall be denied.[17]

---

[17]    The Court notes that recent Supreme Court and Tenth Circuit cases do not support Jackson's challenge to Oklahoma's lethal injection protocol. Discussions in <u>Baze v. Rees</u>, 553 U.S. 35

**XIII.   Accumulation of errors (ground thirteen)**

In his thirteenth ground for relief, Jackson claims that the aggregate impact of the errors in his case warrants relief because he was deprived of a fundamentally fair trial. Dkt. # 15 at 179. The OCCA considered his claim in Proposition X of Petitioner's direct appeal, and held that, "[w]e have reviewed Jackson's claims of error and the record in this case and conclude that, although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or make his sentence unreliable." Jackson, 146 P.3d at 1168.

Cumulative error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (internal quotations omitted) (citing Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)). In Jackson's case, the OCCA did engage in cumulative error analysis and determined the aggregate of individual errors did not deny him a fundamentally fair trial.

This Court has reviewed the following trial errors together insofar as they concern federal constitutional issues: (1) ineffective assistance of counsel claim in part of ground 2; (2) Miranda violation discussed in ground 6; and (3) the trial judge's absence from the courtroom discussed in ground 11. The errors, however, were harmless or non-prejudicial. The Court cannot find under the facts of this case that the cumulative effect of the errors deprived Jackson of a fair trial. See Newsted

---

(2008), Wackerly v. Jones, 398 Fed. Appx. 360 (10th Cir. 2010) (unpublished), Hamilton v. Jones, 472 F.3d 814 (10th Cir. 2007), and Patton v. Jones, 193 Fed. Appx. 785 (10th Cir. 2006) (unpublished), support this Court's conclusion that Jackson's ground twelve claim is without merit.

v. Gibson, 158 F.3d 1085 (10th Cir. 1998); Moore v. Reynolds, 153 F.3d 1086 (10th Cir. 1998);

United States v. McKneely. 69 F.3d 1067, 1080 (10th Cir. 1995). Having rejected each of Jackson's

habeas claims, and determined that his rights were not substantially affected by the cumulative effect

of any errors, the Court finds Jackson has shown no cumulative error warranting a new trial.

## XIV.   Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs

that "[t]he district court must issue or deny a certificate of appealability when it enters a final order

adverse to the applicant."  The Court recognizes that "review of a death sentence is among the most

serious examinations any court of law ever undertakes." Brecheen v. Reynolds. 41 F.3d 1343, 1370

(10th Cir. 1994). To be granted a certificate of appealability, however, Jackson must demonstrate

a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner

can satisfy that standard by demonstrating that the issues raised are debatable among jurists of

reason or that the questions deserve further proceedings. Miller-El v. Cockrell, 537 U.S. 322, 327

(2003). "Obviously the petitioner need not show that he should prevail on the merits. He has already

failed in that endeavor." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citations omitted).

The Court reviewed each of Jackson's propositions of error, and found none of the claims

merited or warranted habeas relief.  However, the Court recognizes that some of Jackson's stated

issues relate to the alleged deprivation of one of his constitutional rights, which, if substantiated,

could entitle him to habeas relief. In order to ensure that these issues receive the type of review on

appeal which should be accorded such serious matters, the Court has carefully considered each issue

and finds that the following enumerated issues could be debated among jurists or could be resolved

differently by another court:

Ground 2-     ineffective assistance of counsel;
Ground 6 -    admission of pre-<u>Miranda</u> statements at trial; and
Ground 11 -   absence of trial judge from courtroom.

Additionally, this Court finds that these same issues are adequate to deserve encouragement to proceed further. <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (citing <u>Barefoot</u>, 463 U.S. at 893).

**ACCORDINGLY IT IS HEREBY ORDERED** that:

1.      The petition for a writ of habeas corpus (Dkt. # 15) is **denied**.

2.      A certificate of appealability is granted as to the claims enumerated hereinabove.

3.      A separate judgment shall be entered in this matter.

**DATED** this 26th day of August 2013.

James H. Payne
United States District Judge
Northern District of Oklahoma

71